943 F.Supp. 1143 (1996)
Henry G. JAKOBE, Jr., Plaintiff,
v.
RAWLINGS SPORTING GOODS COMPANY, et al., Defendants.
No. 4:95CV2288-DJS.
United States District Court, E.D. Missouri, Eastern Division.
September 23, 1996.
*1144 *1145 *1146 *1147 Roy A. Walther, III, Walther and Glenn, St. Louis, MO, Don R. Lolli, Partner, Beckett and Lolli, Kansas City, MO, Dennis J. Johnson, South Burlington, VT, Lee S. Shalov, Ralph M. Stone, Milberg & Weiss, New York City, for Henry G. Jakobe, Jr.
Glenn E. Davis, Frank N. Gundlach, Edwin L. Noel, Armstrong and Teasdale, St. Louis, MO, for Rawlings Sporting Goods Company, Inc.
Glenn E. Davis, Frank N. Gundlach, Edwin L. Noel, Susan Cohen Levy, David C. Bohan, Jenner and Block, Chicago, IL, for Carl J. Shields and Harold B. Keene.

ORDER
STOHR, District Judge.
On November 22, 1995, plaintiff Henry G. Jakobe, Jr. filed a class action complaint against Rawlings Sporting Goods Company, Inc. ("Rawlings"), Carl J. Shields and Howard B. Keene[1] alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Plaintiff's complaint stems from defendants' alleged misstatements and omissions *1148 regarding the adverse effects of the 1994 baseball strike on the sale of Rawlings' baseball-related products and the price of Rawlings common stock. Defendants' joint motion to dismiss is pending before the Court.

A. Factual Background
From 1967 until July 8, 1994, Rawlings was a wholly owned subsidiary of Figgie International, Inc. ("Figgie"). On July 8, 1994, Figgie sold 100% of its ownership interest in Rawlings pursuant to an initial public offering. In the initial public offering, 7,650,000 shares of Rawlings common stock were sold to the investing public at a price of $12.00 per share. The common stock of Rawlings is actively traded on the NASDAQ National Market Systems.
Plaintiff acquired 1000 shares of Rawlings common stock in a three month period between December, 1994 and March, 1995: 200 shares on December 19, 1994 at a share price of $13.75; 300 shares on February 6, 1995 at a share price of $14.25; and 500 shares on March 17, 1995 at a share price of $10.75.
On March 24, 1995, Rawlings entered into an amendment of its credit agreement with the First National Bank of Chicago. Pursuant to this agreement, Rawlings' pre-existing credit agreement was amended to increase Rawlings' line of credit from $2 to $3 million.
Rawlings is a major supplier of team sports equipment in North America and Japan, with net revenues of $144.1 million in fiscal year 1995. Rawlings manufactures and sells a broad array of baseball, basketball, football and hockey equipment. Since 1977, Rawlings has been the exclusive supplier of baseballs to the National and American Leagues. Since 1994, Rawlings has been the exclusive supplier of baseballs to each of the 18 minor leagues. Rawlings is also the leading supplier of baseball gloves to major and minor league players.
In the United States, Rawlings sells its products directly to approximately 2,500 customers including local sporting good stores, institutional dealers, regional sporting goods chains, national sporting goods chains, sporting goods mega stores and mass merchandisers.
Rawlings' sale of baseball-related products is seasonal. Typically, Rawlings' customers place orders for baseball-related products beginning in July for shipment beginning in October (pre-season orders). These pre-season orders represent approximately 75-80% of Rawlings' sales of baseball-related products during a particular year and largely determine Rawlings' revenues and profitability between October 1 and March 31. Rawlings thereafter receives additional "fill-in" orders depending upon each customer's actual product sales ("sell-through"). Fill-in orders typically account for the remaining 20-25% of Rawlings' sales of baseball-related products during a particular year.
Defendant Shields has been the Chairman of the Board of Directors, Chief Executive Officer and President of Rawlings since July, 1994. As of December 2, 1994, Shields was the beneficial owner of 4,381 shares of Rawlings common stock. In connection with the initial public offering, Shields was granted 108,332 options to purchase shares of Rawlings common stock.
Defendant Keene was Rawlings' Vice President for Foreign Activity and Procurement from November, 1992 to April, 1995. In April, 1995, Keene became Rawlings' Chief Operating Officer. As of December 2, 1994, Keene was also Secretary of Rawlings' Board of Directors. As of December 2, 1994, Keene was the beneficial owner of 3,230 shares of Rawlings common stock. In connection with the initial public offering, Keene was granted 41,250 options to purchase shares of Rawlings common stock. On January 23, 1995, Keene sold 3,230 shares of his Rawlings common stock at a price of $12.88 per share and received approximately $41,600.
On August 12, 1994, major league baseball players went on strike. The strike lasted approximately eight months  the longest work stoppage in professional sports history.

B. Plaintiff's Class Action Complaint
In Count I, plaintiff seeks damages for violations of § 10(b) of the Securities Exchange Act of 1934 ("the Act") and Rule 10b-5 promulgated thereunder. Plaintiff alleges that defendants made various untrue statements *1149 of material fact and omitted material facts in order to (1) conceal from investors and Rawlings' lenders adverse information concerning Rawlings' performance; (2) artificially inflate and maintain the market price of Rawlings common stock; and (3) permit Keene to dispose of his Rawlings stock at artificially inflated prices. Plaintiff claims that there was a "fraud on the market" during the alleged class period from November 8, 1994 through June 30, 1995. Plaintiff challenges certain public statements and omissions made by Rawlings' management during the class period as being overly optimistic in light of the baseball strike.
In Count II, plaintiff asserts "controlling person" liability against Keene and Shields under § 20(a) of the Act. Plaintiff alleges that Keene and Shields are liable as direct participants in the above-referenced unlawful conduct and that Keene and Shields exercised control and influenced Rawlings to engage in the above-referenced unlawful conduct.

C. Consideration of Documents Integral to the Complaint
Most of the allegedly actionable statements set forth in the complaint were culled from press releases, an annual report and an SEC filing.[2] Plaintiff has not attached the full text of any of these documents to his complaint. Defendants, however, have attached each of the documents to their motion to dismiss.[3] Plaintiff has not objected to the attachments and, in fact, has referred to them in his memorandum in opposition to defendants' motion to dismiss. See Pltf. Mem. in Opp., p. 13, n. 5.
Before ruling on the motion to dismiss, the Court must address the threshold question of whether it may properly consider the full text of these documents which are partially quoted and referred to in plaintiff's complaint. Although the Eighth Circuit has not addressed the issue, other circuits have found that where a plaintiff does not attach to his complaint a public document upon which he relies, a defendant may produce such document in support of a motion to dismiss if the document is integral to the complaint. See, e.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 809 (2d Cir.1996) (finding that the district court properly considered the full text of documents in ruling on a motion to dismiss in a securities fraud case); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 46-48 (2d Cir.1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992) (in construing a motion pursuant to Fed.R.Civ.P. 9(b) or 12(b)(6) in a securities fraud case, a court may consider documents outside of the complaint to the extent they are integral to plaintiff's complaint); Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1018 (5th Cir. 1996) (in ruling on a motion to dismiss a securities fraud claim, a court may consider the contents of certain relevant public disclosure documents for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents). At least one district court in this circuit has agreed. See Brogren v. Pohlad, 933 F.Supp. 793, 797-99 (D.Minn.1995).
The Court finds that it is proper to consider the statements in question in their context and that the documents in question are integral to plaintiff's complaint. Accordingly, the Court will consider the full texts of the relevant public disclosure documents to determine what statements the documents contain.

D. The Standard for a Motion to Dismiss
For the purposes of defendants' motion to dismiss, the Court takes all facts alleged in plaintiff's complaint as true. Westcott v. Omaha, 901 F.2d 1486, 1488 (8th Cir.1990). The Court construes the allegations set forth in the complaint and reasonable inferences arising therefrom favorably to plaintiff. *1150 Morton v. Becker, 793 F.2d 185, 187 (8th Cir.1986). Nonetheless, the Court need not adopt inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the complaint, nor must the Court accept legal conclusions cast in the form of factual allegations. Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 2944-45, 92 L.Ed.2d 209 (1986).

E. Plaintiff's Factual Allegations
Generally, plaintiff alleges that defendants' optimistic statements regarding Rawlings' current financial status and future prospects were false and misleading because defendants were aware of undisclosed facts that would undermine the accuracy of the representations. Specifically, plaintiff alleges that defendants knew but did not disclose in a timely manner that Rawlings was not receiving fill-in orders, customers were cancelling orders and the demand for baseball products was deteriorating as a result of the baseball strike. Plaintiff attempts to provide a factual basis for these allegations by making statements regarding what seven of Rawlings' customers were experiencing. For the most part, however, plaintiff has failed to allege (1) if, (2) when, and/or (3) how much of what each customer was experiencing the customer conveyed to Rawlings. The relevant factual allegations are as follows:
Herman's Plaintiff alleges that in August, 1994, Herman's became concerned that the baseball strike would affect sales of baseball-related products. Plaintiff further alleges that the softening demand for baseball-related products became readily apparent at Herman's by February, 1995 and that in March, 1995, sales of baseball equipment at Herman's were flat and sales of Rawlings' baseballs were disappointing. Plaintiff does not plead that Herman's conveyed this information to Rawlings, or that Rawlings was aware of this information. Complaint, ¶¶ 41-43.[4]
Koenig Sporting Goods Plaintiff alleges that in August, 1994, Koenig cut its order of Rawlings' products by as much as 15%. Plaintiff further alleges that by April of 1995, Koenig was not getting any "sell-through" with regard to Rawlings' products. Sales of baseball equipment "just weren't happening." The only factual allegation which the Court can infer that Rawlings was aware of is that in August of 1994, "Koenig cut its order by as much as 15%." Plaintiff does not plead that Koenig conveyed the remaining information to Rawlings, or that Rawlings was aware of the information. Complaint, ¶¶ 44-45.[5]
Sportmart Plaintiff alleges that in November or December of 1994, sales of baseball equipment at Sportmart began to drop. Plaintiff does not allege that this fact was conveyed to Rawlings, or that Rawlings was aware of this fact. Plaintiff further alleges that in January or February of 1995, Sportmart canceled prior orders of Rawlings' products and told Rawlings that business was "shot". Complaint, ¶¶ 46-49.
The Sports Authority Plaintiff alleges that the decline in baseball equipment became evident at Sports Authority no later than April, 1995 when Sports Authority notified Rawlings that it would not accept the projected orders it had made earlier in the year and canceled orders by at least 5%. Plaintiff makes further allegations, none of which it claims were known by Rawlings. Complaint, ¶¶ 50-52.
*1151 Big 5 Sports Plaintiff alleges that the softening demand for baseball equipment became noticeable at Big 5 Sports in January or February of 1995, when Big 5 Sports stated Rawlings had "lost influence." Plaintiff does not plead that Rawlings was aware of this information, or that Big 5 conveyed this information to Rawlings. Complaint, ¶ 53.
Hibbett Sporting Goods Plaintiff alleges that Hibbett noticed a drop-off in baseball equipment sales by the end of February or early March, 1995 and that its baseball sales were "flat". Plaintiff does not allege that this information was conveyed to Rawlings. Complaint, ¶ 54.
Paragon Plaintiff alleges that by February or March of 1995, Paragon noticed a decline in sales of baseball-related merchandise and notified Rawlings that it would not accept some of its advance orders. Complaint, ¶ 55.
Although plaintiff summarily claims that defendants knew that at least seven Rawlings' customers were experiencing a decline in sales and cancelling orders, taking plaintiff's allegations as true, only on four occasions where a customer experienced a decline in demand of baseball-related merchandise does plaintiff allege that Rawlings was aware of the fact, to wit: (1) in August of 1994, after the baseball strike was announced, Koenig cut its orders of Rawlings' products by as much as 15%; (2) in January or February of 1995, Sportmart canceled prior orders of Rawlings' products and company representatives told Rawlings that business was "shot" and that gloves which had previously been ordered should not be shipped; (3) by February or March of 1995, Paragon observed a noticeable decline in sales of baseball-related merchandise and notified Rawlings that it would not accept some of its advance orders; and (4) no later than April of 1995, Sports Authority notified Rawlings that it would not accept the projected orders it had made earlier in the year  cancellations of orders were at least 5% and likely much more.
These four factual allegations are the basis for plaintiff's claims that defendants (1) should have known that sales of Rawlings' baseball products were and would continue to be below expected levels and (2) should have been able to process and disclose that information prior to the disclosures in May and June of 1995.

F. Pleading Securities Fraud[6]
To state a claim for securities fraud in violation of § 10(b) and Rule 10b-5, plaintiff must allege the following:
(1) that the defendant acted in a manner prohibited by the Rule, whether it be that the defendant employed a device, scheme, or artifice to defraud, made misrepresentations or omissions of material fact, or engaged in acts, practices, or courses of business that operate as a fraud or deceit; (2) causation, often analyzed in terms of materiality and reliance; (3) damages; and (4) that the fraudulent activity occurred in connection with the purchase or sale of a security.
Harris v. Union Elec. Co., 787 F.2d 355, 362 (8th Cir.), cert. denied, 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986); In re Control Data Corp. Secs. Litig., 933 F.2d 616, 619 (8th Cir.1991) ("Although the text of Rule 10b-5 does not directly require proof of scienter, causation, or damages, it is settled that these are essential elements of a Rule 10b-5 claim.")
Plaintiff is proceeding under a "fraud on the market" theory. Under this theory, the element of reliance will be presumed based upon a sufficient allegation that the misrepresentation is material. Under a "fraud on the market" theory,
causation is not premised on any specific transaction between plaintiff and defendant, nor is there required any proof that the plaintiff was aware that a misrepresentation was made. Causation lies in the fact *1152 that the plaintiff relied on the market price of the security as an indicator of the future value of the stock. To the extent that the defendant's misrepresentations artificially altered the price of the stock and defrauded the market, causation is presumed.
In re Control Data Corp. Secs. Litig., 933 F.2d at 619 citing Basic Inc. v. Levinson, 485 U.S. 224, 227, 108 S.Ct. 978, 981, 99 L.Ed.2d 194 (1988).
To fulfill the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information available." Basic Inc. v. Levinson, 485 U.S. at 231-32, 108 S.Ct. at 983-84 (1988). The definition of materiality is the same whether misrepresentations or omissions are involved. Kramas v. Security Gas & Oil, Inc., 672 F.2d 766, 769 (9th Cir.), cert. denied, 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982).
In addition, pursuant to Fed.R.Civ.P. 9(b), all allegations of fraud must be stated with particularity. The particularity requirement of Rule 9(b) "has been strictly applied in the context of securities fraud litigation as a means of deterring frivolous suits." Weisburgh v. St. Jude Medical, Inc., 158 F.R.D. 638, 642 (D.Minn.1994), aff'd, 62 F.3d 1422 (8th Cir.1995). Moreover, to plead securities fraud, plaintiff "must allege that the necessary information lies within the defendants' control, and [his] allegations must be accompanied by a statement of the facts upon which the allegations are based." Craftmatic Secs. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir.1989).
Finally, § 20(a) of the Act imposes joint and several liability on any person who directly or indirectly, controls any person liable for securities fraud under the Act, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violation. 15 U.S.C. § 78t(a). The statute can reach persons who have "some indirect means of discipline or influence" but less than actual control. Martin v. Shearson Lehman Hutton, Inc., 986 F.2d 242, 243 (8th Cir.1993). To state a claim for controlling person liability in violation of § 20(a) of the Act, plaintiff must assert that Shields and Keene had the power to control or influence Rawlings regarding the alleged statements and/or omissions.

G. Defendants' Motion to Dismiss
Defendants make several arguments in support of their motion to dismiss.

(1) Defendants claim that plaintiff has failed to plead fraud with particularity.
Defendants claim that plaintiff has not adequately pled fraud under both Fed.R.Civ.P. 9(b) and 12(b)(6). Plaintiff has set forth a number of statements and for each of the statements indicated who made the statement, what the statement was, when and where it was made, and to whom it was made. Plaintiff's general theory of fraud is that defendants created unfounded optimism about Rawlings in light of the baseball strike and concealed material facts regarding a decline in sales and orders. Plaintiff alleges that defendants knew that the baseball strike was and would continue to have an adverse impact on Rawlings. Defendants argue, however, that plaintiff has failed to state with sufficient particularity how the statements were fraudulent. The Court will address this argument below as it relates to the individual statements in question.

(2) Defendants claim that Rawlings' optimistic statements are simply "puffery" and not actionable.
Defendants claim that the statements in question are "soft information" which includes statements of subjective analysis, such as opinions or intentions, or forward looking statements such as projections, estimates, and forecasts. Craftmatic Secs. Litig. v. Kraftsow, 890 F.2d at 642. Allegations that a company made general, vague, and optimistic statements are insufficient to state a claim for securities fraud. Raab v. General Physics Corp., 4 F.3d 286, 289-90 (4th Cir. 1993) (soft, "puffing" statements generally lack materiality). The Court will address this argument below as it relates to the individual statements in question.

*1153 (3) Defendants claim that the predictions of future performance are not actionable because they were well-grounded in fact and plaintiff has failed to set forth particular facts known to defendants at the time the predictions were made, which would eliminate any reasonable basis for the predictions.
Defendants claim that their alleged failure to properly predict the future is not actionable under federal securities law. Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 513 (7th Cir.1989) ("Forward-looking statements need not be correct; it is enough that they have a reasonable basis.") Because predictions of future performance are inevitably inaccurate, when forward-looking statements are alleged to be fraudulent, plaintiff must allege specific facts which illustrate that the predictions lacked a reasonable basis when made. In re HealthCare Compare Corp. Secs. Litigation, 75 F.3d 276, 281 (7th Cir.1995); See also In re Marion Merrell Dow Inc., Secs. Litig. II, No. 93-0251-CV-W-6, at n. 12, 1994 WL 396187 (W.D.Mo. July 18, 1994) (plaintiff must plead with adequate specificity how the alleged predictions were so inconsistent with the facts that were not disclosed as to eliminate any reasonable basis for the predictions).
Defendants also claim that their forward-looking statements are protected under the SEC safe harbor rules. These rules provide that "a forward looking statement" is not fraudulent "unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith." 17 C.F.R. § 240.3b-6. Forward looking statements from Rawlings' 10-K and 1994 Annual Report potentially fall within this safe harbor. See Wielgos v. Commonwealth Edison Co., 892 F.2d at 512 (a 10-K is a document filed with the Commission and thus qualifies for the safe harbor). The forward looking statements at issue which were culled from press releases do not qualify for the safe harbor. See Stransky v. Cummins Engine Co., 51 F.3d 1329, 1333 n. 8 (7th Cir.1995) (the safe harbor provisions apply to forward looking statements "filed with the Commission" which would not encompass press releases).
The Court will address these arguments below as they relate to the individual statements in question.

(4) Defendants claim that the predictions of future performance are not actionable under the "bespeaks caution" doctrine.
Defendants argue that under the "bespeaks caution doctrine" an optimistic, concrete prediction is immaterial if it is sufficiently accompanied by cautionary language. Mayer v. Mylod, 988 F.2d 635, 639 (6th Cir.1993). Defendants argue that plaintiff cannot base his federal securities fraud claim on forward looking statements which were accompanied by disclosures of underlying factual assumptions. The Court will address this argument below as it relates to the individual statements in question.

(5) Defendants claim the alleged misstatements and omissions are immaterial as a matter of law.
Defendants argue that the statements and omissions in question are so vague that no reasonable investor could view them as having significantly altered the total mix of available information, thus, they are immaterial as a matter of law. Basic Inc. v. Levinson, 485 U.S. at 231-32, 108 S.Ct. at 983-84 (1988). The Court will address this argument below as it relates to the individual statements and/or omissions in question.

(6) Defendants claim that plaintiff has failed to plead the requisite scienter.
Defendants allege that plaintiff has failed to plead the requisite scienter required under Fed.R.Civ.P. 9(b) and Rule 10b-5. Plaintiff has made general allegations of scienter,[7] however, the Court finds that these general averments of scienter are insufficient. Rote conclusory allegations that defendants "knowingly did this" or "recklessly did that" fail to meet the heightened pleading requirements of Rule 9(b). Lovelace *1154 v. Software Spectrum, Inc., 78 F.3d at 1019. Plaintiff "must plead some factual basis giving rise to a strong inference of fraudulent intent." In re Marion Merrell Dow Inc. Securities Litig. II, No. 93-0251-CV-W-6, 1994 WL 396187 *8 (W.D.Mo. July 18, 1994) citing Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir.1987). "Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud, or (2) identify circumstances that indicate conscious behavior on the part of defendant. Lovelace v. Software Spectrum, Inc., 78 F.3d at 1018-19. Allegations are inadequate to indicate conscious behavior on the part of defendant when the "complaint contains no assertion of any fact that makes it reasonable to believe that the defendants knew that any of their statements were materially false or misleading when made." Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068-69. (5th Cir.1994).
In addition, plaintiff states that he has set forth specific facts and motives which support a strong inference of fraudulent intent. Plaintiff has alleged that defendant Keene sold his shares of Rawlings stock on January 23, 1995, Complaint, ¶ 30, and that on March 24, 1995, Rawlings entered into an amendment to its credit agreement with the First National Bank of Chicago to increase Rawlings' line of credit. Complaint, ¶ 33. Plaintiff also states that he has set forth sufficient factual detail to show that defendants were aware of declining sales and order cancellations that contradicted public statements made to Rawlings' investors.
Plaintiff has alleged that defendants had access to withheld information during the class period, that defendant Keene sold his stock shortly before defendants' disclosure of adverse financial information,[8] and that Rawlings amended its credit agreement shortly before the disclosure of the adverse information. Viewing the complaint in the light most favorable to plaintiff, the Court finds that plaintiff has adequately pled scienter.

H. Plaintiff's Allegations of Fraud
Generally, plaintiff alleges that after the baseball strike began on August 12, 1994, defendants fraudulently assured investors that Rawlings was poised for future growth, disseminated optimistic earnings and revenue predictions and denied that the strike was having or would have an adverse impact on Rawlings' financial condition. Complaint, ¶ 24. To determine whether plaintiff has stated a claim, the Court will not address each paragraph of the complaint, but will analyze each allegedly fraudulent statement in chronological order and consider the statements and omissions individually and in context with each other.[9] The Court will also consider the effect of the statements in their aggregate, as part of the total mix of information available to investors.

(1) Form 10-K for the transition period from January 1, 1994 through August 31, 1994 (complaint, ¶ 28).
Rawlings' Form 10-K for the transition period from January 1, 1994 through August 31, 1994[10] states:
The players' strike which interrupted the 1994 Major League Baseball season, had minimal impact on the Company. If the strike were to continue through the 1995 baseball season, the Company's revenue would be impacted by approximately $3.5 million. *1155 Rawlings' Form 10-K, p. 21. Plaintiff alleges that through this statement, defendants "downplayed the effects of the strike and falsely projected that even an extended strike would have no significant impact on the Company's financial results." Complaint, ¶ 28. The Court finds that the allegations in ¶ 28 of the complaint fail to state a claim for securities fraud.
First, the statement that Rawlings' revenue would be adversely impacted by approximately $3.5 million if the strike continued through the 1995 baseball season is a prediction. A prediction is only actionable under the securities laws if issued without good faith or if the prediction lacked a reasonable basis when made. Kowal v. MCI Communications Corp., 16 F.3d 1271, 1277 (D.C.Cir.1994); see also Arazie v. Mullane, 2 F.3d 1456, 1466 (7th Cir.1993) (a company's predictions are protected so long as they have a reasonable basis in fact  a poor prediction will not automatically subject a company to suits under the securities law). To state a claim based upon defendants' prediction regarding the impact of the strike, plaintiff must allege sufficient facts to show that the prediction, which was made less than twenty days after the baseball strike began, lacked a reasonable basis when made.
Plaintiff's only allegation which predates this August 31, 1994 prediction is that "in August, 1994, after the baseball strike was announced, Koenig cut its orders of Rawlings' products by as much as 15%". Complaint, ¶ 45.[11] This allegation is insufficient to show that Rawlings' estimated projection of the impact of the baseball strike on its revenue was not made in good faith or lacked a reasonable basis when made. See In re Marion Merrell Dow Inc., Secs. Litig. II, No. 93-0251-CV-W-6, at n. 12 (W.D.Mo. July 18, 1994) (plaintiff must plead with adequate specificity how the alleged projection was so inconsistent with known information that defendants lacked a reasonable basis for the prediction). Moreover, Rawlings' prediction in the 10-K falls within the SEC's safe harbor for forward looking statements "unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith." 17 C.F.R. 240.3b-6. Plaintiff has not made such a showing.
Second, plaintiff fails to set forth any particular allegations to show that defendants' statement that the players' strike "had minimal impact on the Company" was fraudulent when made. Plaintiff has not challenged any of the financial information set forth in the 10-K. Once again, the Court notes that the only allegation which predates this August 31, 1994 statement is that "Koenig cut its order of Rawlings' products by as much as 15%." Complaint, ¶ 45. The fact that one of Rawlings 2500 customers "cut orders" is not so inconsistent with the statement that the strike "had minimal impact" on Rawlings to render the statement fraudulent.
To the extent that plaintiff alleges that defendants should have disclosed the fact that "Koenig cut its orders of Rawlings' products by as much as 15%", the Court finds that this fact is immaterial as a matter of law[12] and that defendants had no duty to *1156 disclose it. When an allegation of fraud under § 10(b) and Rule 10b-5 is based on a nondisclosure, as opposed to an affirmative misrepresentation, there can be no finding of fraud absent a duty to speak. Lorenz v. CSX Corp., 1 F.3d 1406, 1418 (3d Cir.1993). "A duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." Chiarella v. United States, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). A corporation is under a duty to disclose "any material facts that are necessary to make disclosed material statements ... not misleading." Craftmatic Secs. Litig. v. Kraftsow, 890 F.2d at 641. If Rawlings had a duty to disclose whether each customer increased or decreased its orders, shareholders would be buried in an "avalanche of trivial information  a result that is hardly conducive to informed decisionmaking." TSC Industries v. Northway, Inc., 426 U.S. 438, 448-49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).
The Court will dismiss plaintiff's claims alleged in paragraph 28 of his complaint arising from Rawlings' Form 10-K for the transition period from January 1, 1994 through August 31, 1994 for failure to state a claim.

(2) November 8, 1994 press release (complaint, ¶ 25).
On November 8, 1994, Rawlings issued a press release wherein defendants announced Rawlings' interim financial results for the eight months ended August 31, 1994. The press release states:
Mr. Shields went on to say that 1995 preseason baseball equipment orders continue to be strong and that the Company remains optimistic as it heads into its first fiscal year.
Plaintiff contends that this statement was materially false and misleading because customers were ordering few if any of Rawlings' baseball-related products, customers were actually cancelling orders for Rawlings' products, and sales of baseball-related products "weren't happening" and were "shot". Complaint, ¶ 56(a). Plaintiff further alleges that defendants lacked a reasonable basis for their optimism. The Court finds that the allegations in ¶ 25 of the complaint fail to state a claim for securities fraud.
First, plaintiff has not challenged any of the financial information showing that for the eight months ending August 31, 1994 Rawlings' orders and revenue were up substantially over the prior year. On the contrary, plaintiff again relies on a single factual allegation which predates this November 8, 1994 press release  that "in August, 1994, after the baseball strike was announced, Koenig cut its orders of Rawlings' products by as much at 15%". Complaint, ¶ 45. As discussed above, the Court finds that Rawlings had no duty to disclose this immaterial fact.
Second, defendants' vague statement that Rawlings "remains optimistic" is not actionable. This statement of "optimism" is puffery which cannot form the basis of a claim for securities fraud. See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d at 811 (statement that "we are optimistic about 1993" is puffery  not a definite, positive projection); See also Alfus v. Pyramid Tech. Corp., 745 F.Supp. 1511, 1519 (N.D.Cal.1990) (vague, optimistic expressions are "puffing" and cannot form the basis for 10b-5 liability). Even if the Court viewed this statement of optimism as a prediction, plaintiff has failed to plead any facts to show that the prediction lacked a reasonable basis when made. Moreover, plaintiff omits the following from Shields' statement:
Supporting this optimism is the fact that the Company backlog at the end of October 1994 is up 14.8% or $8.7 million compared to same period last year.
"A history of successful operations in many circumstances may provide management with a reasonable basis for predictions of similar prospects in the future." Kowal v. MCI Communications Corp., 16 F.3d at 1279. Here, Rawlings' unchallenged reports of its successful operations provide a reasonable basis for defendants' optimism.
*1157 The Court will dismiss plaintiff's claims alleged in paragraph 25 of his complaint arising from Rawlings' November 8, 1994 press release for failure to state a claim.

(3) Rawlings' 1994 Annual Report (complaint, ¶¶ 26-27).
On December 9, 1994, Rawlings filed its 1994 Annual Report with the SEC. The Annual Report included a letter from Shields to Rawlings' shareholders. The Annual Report states:
Sell-through problems have been corrected, too: Orders look very strong as we begin the new fiscal year. Our backlog of orders this October is up 14.8% over the previous year's figure. This indicates a strong level of initial stocking activity among sporting goods dealers for the 1995 baseball season.
* * * * * *
Despite the difficulties experienced over the past 12 months, I'm confident that this business is sound and poised for growth.
* * * * * *
Rawlings will probably feel some impact from the players' strike if it extends into the 1995 season, because we are the exclusive supplier of baseballs to the American League, the National League and the World Series, as well as the leading supplier of accessories to major league players and teams. However, this potential lost business represents less than 3% of the company's total revenues. Will the strike have a ripple effect on the company's remaining baseball business? In the past, that hasn't been the case: Our nonmajor league baseball sales weren't significantly affected by any of the seven other work stoppages that have occurred in professional baseball since 1972. Despite recurring problems between major league players and owners, the game itself keeps going strong  in amateur and minor league parks across America.
1994 Annual Report, pp. 3-4, 9.
Plaintiff alleges that the statements that "orders look very strong", "this indicates a strong level of initial stocking", and "business is sound and poised for growth" were materially false and misleading when made because customers were ordering few if any of Rawlings' baseball-related products, customers were cancelling orders, and sales were down. Plaintiff further alleges that defendants' optimistic statements regarding the effects of the baseball strike on Rawlings' business and financial condition lacked a reasonable basis because defendants knew or should have know that the baseball strike was having and would continue to have a direct and materially adverse impact on Rawlings' financial condition and future profitability. Complaint, ¶ 55.
First, defendants' statements that "orders look very strong", "this indicates a strong level of initial stocking", and "business is sound and poised for growth" are not actionable. Again, plaintiff's only factual allegation which predates this Annual Report is that "in August, 1994, after the baseball strike was announced, Koenig cut its orders of Rawlings' products by as much as 15%". Complaint, ¶ 45. Plaintiff has not challenged the statement that Rawlings' backlog of orders was up 14.8%, but presumably claims that the statements that "orders look very strong", "this indicates a strong level of initial stocking" and "business is sound and poised for growth" were misleading because Rawlings should have disclosed the fact that "Koenig cut its orders of Rawlings' products by as much as 15%". The Court has previously found that as a matter of law, when reporting factual information regarding its backlog of orders, Rawlings had no duty to disclose that one of a Rawlings' 2500 customers had "cut orders".
Moreover, Shields' statement that "I'm confident that this business is sound and poised for growth" is a soft, puffing statement which is immaterial as a matter of law. See Raab v. General Physics Corp., 4 F.3d at 289. Additionally, plaintiff has failed to plead with any specificity how the prediction that business was "poised for growth" lacked a reasonable basis. As previously noted, an unchallenged history of past performance provides a sound basis for predicting future success. Kowal v. MCI Communications Corp., 16 F.3d at 1279.
*1158 Next, defendants' predictions regarding the possible effects of the baseball strike are not actionable. Although plaintiff alleges in conclusory fashion that the predictions were not well-grounded in fact, the Annual Report itself sets forth the basis for the predictions  that Rawlings' past experience with each of the seven major work stoppages since 1972 indicated that the overall baseball market would remain stable and that Rawlings' non-major league baseball sales would not be significantly affected. Plaintiff has failed to plead with any specificity how the predictions of the effects of the baseball strike lacked a reasonable basis. Moreover, defendants' predictions in the Annual Report fall within the SEC's safe harbor for forward looking statements "unless it is shown that such statement[s] [were] made or reaffirmed without a reasonable basis or [were] disclosed other than in good faith." 17 C.F.R. § 240.3b-6. Plaintiff has not made such a showing.[13]
Finally, plaintiff challenges defendants' statement that the potential lost business from sales to major league teams "represents less than 3% of the company's total revenues." As previously noted, allegations of securities fraud must be accompanied by a statement of the facts upon which the allegations are based. Craftmatic Secs. Litig. v. Kraftsow, 890 F.2d at 645. Plaintiff has failed to plead how this statement was fraudulent or in what way it lacked a reasonable basis.
The Court will dismiss plaintiff's claims alleged in paragraphs 26 and 27 of his complaint arising from Rawlings' 1994 Annual Report for failure to state a claim.

(4) January 13, 1995 conference call with securities analysts (complaint, ¶ 29).
Plaintiff alleges that on or about January 13, 1995, defendants held a conference call with securities analysts and other members of the investment community.[14] Plaintiff alleges that
[d]uring the call, management stated that the Company's backlog was continuing to grow in the second quarter and also reconfirmed Rawlings' optimism regarding results for the remaining three quarters.
Plaintiff further alleges that
[t]hese and other statements were reflected in an analyst report disseminated by Dillon, Read & Co., which rated the Company's stock a "1", or "Buy".
Complaint, ¶ 29.
It appears that plaintiff is attempting to hold defendants responsible for the report disseminated by Dillon, Read & Co. Defendants may be liable for analysts' forecasts which they "fostered and reviewed but failed to correct if [they] expressly or impliedly represented that the information was accurate or coincided with the company's views." Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir.1980). Defendants cannot be liable under federal securities law for projections made by securities analysts absent evidence that the projections were issued or adopted by defendants. Raab v. General Physics Corp., 4 F.3d at 288. "Allegations based on this theory of liability must legally support a conclusion that the company adopted, endorsed or sufficiently entangled itself with the forecasts to render them attributable to him." In re Caere Corporate *1159 Secs. Litig., 837 F.Supp. 1054, 1059 (N.D.Cal. 1993). Moreover, Fed.R.Civ.P. 9(b) requires a plaintiff who alleges a corporation's responsibility for analysts' statements to "(1) identify specific forecasts and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred." In re Time Warner Inc. Secs. Litig., 9 F.3d 259, 264 (2d Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1397, 128 L.Ed.2d 79 (1994). Plaintiff has failed to satisfy these pleading requirements and thus, has not sufficiently pled that defendants may be liable for the fact that Dillon, Read & Co. rated Rawlings stock a "1" or "Buy".
Plaintiff's allegations that "during the call, management stated that the company's backlog was continuing to grow" and that management "reconfirmed Rawlings' optimism regarding results for the remaining three quarters", do not state a claim for securities fraud. Again, plaintiff does not challenge the factual statement that Rawlings' backlog was growing. As of January, 1995, plaintiff's only allegations supporting his claim of fraud are that in August, 1994, after the baseball strike was announced, Koenig cut its orders of Rawlings' products by as much as 15% and in January or February of 1995, Sportmart canceled prior orders of Rawlings' products and Sportmart representatives told Rawlings that business was "shot" and that gloves which had previously been ordered should not be shipped. Complaint, ¶¶ 45, 48. Defendants' failure to disclose these two facts does not render the statement that the "backlog of orders was continuing to grow" fraudulent. Allegations of securities fraud must be accompanied by a statement of the facts upon which the allegations are based. Craftmatic Secs. Litig. v. Kraftsow, 890 F.2d at 645. Plaintiff has failed to plead how these statements were fraudulent or in what way they lacked a reasonable basis.
Additionally, plaintiff's allegation that management confirmed Rawlings' "optimism" is simply puffing which the Court finds immaterial as a matter of law. See Raab v. General Physics Corp., 4 F.3d at 289; see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d at 811.
The Court will dismiss plaintiff's claims alleged in paragraph 29 of his complaint arising from the January 13, 1995 conference call with securities analysts and the securities analysts' report for failure to state a claim.

(5) March 17, 1995 press release (complaint, ¶ 31).
On March 17, 1995, Rawlings issued a press release and announced expected results for the 1995 second fiscal quarter ended February 28, 1995. The press release stated:
Mr. Shields commented that "revenues for Rawlings' fiscal year ending August 31, 1995 are estimated to be in the neighborhood of $150 million based upon current open orders and the assumption that fill-in orders received by Rawlings during the last six months of its fiscal year come in at the same percentage as they did in Rawlings' fiscal year ended August 31, 1994." Mr. Shields also noted that he remains confident that earnings per share for fiscal 1995 will be ahead of pro forma earnings per share for fiscal 1994 based on current revenue assumptions.
Plaintiff alleges that these revenue and earnings projections were false and misleading because defendants lacked a reasonable basis for the representations and because defendants were aware of undisclosed facts tending to seriously undermine the accuracy of the representations. Complaint, ¶ 55. Plaintiff has made three factual allegations that defendants were aware of the far-reaching effects of the baseball strike as of the time of this press release on March 17, 1995. Plaintiff has alleged that (1) in August of 1994, after the baseball strike was announced, Koenig cut its orders of Rawlings' products by as much as 15%; (2) in January or February of 1995, Sportmart canceled prior orders of Rawlings' products and company representative told Rawlings that business was "shot" and that gloves which had previously been ordered should not be shipped; and (3) by February or March of 1995, Paragon observed *1160 a noticeable decline in sales of baseball-related merchandise and notified Rawlings that it would not accept some of its advance orders. Complaint, ¶¶ 45, 48, 55.
The Court finds that plaintiff has pled with adequate specificity how the alleged projections made on March 17, 1995 were so inconsistent with known information that defendants may have lacked a reasonable basis for the predictions. Plaintiff has pled that three Rawlings' customers were experiencing adverse effects from the baseball strike and had conveyed that information to Rawlings.[15] Plaintiff has further alleged that Rawlings had a duty to disclose this information. Plaintiff has pled that this undisclosed information made Rawlings' projections, which were based on the assumption that fill-in orders received during the last six months would come in at the same percentage as they did in Rawlings' fiscal year ended 1994, fraudulent and misleading.
The Court will not dismiss plaintiff's claims alleged in paragraph 31 of his complaint arising from Rawlings' March 17, 1995 press release.
Plaintiff further alleges that around the same time of the March 17, 1995 press release, Rawlings' management spoke with W.C. Roberts, an analyst from J.J.B. Hilliard, W.L. Lyons, Inc., and that management told Roberts that it was comfortable with consensus earnings estimates of $1.00-$1.05 per share for the 1995 fiscal year. Plaintiff further alleges that this statement was later conveyed in a Hilliard analyst report dated March 28, 1995, which reflected a "buy" rating for Rawlings stock. Complaint, ¶ 32.
Again, it appears that plaintiff is attempting to hold defendants responsible for a report disseminated by a securities analyst. As previously discussed, defendants may only be liable under federal securities law for projections made by securities analysts based upon evidence that the projections were issued or adopted by defendants. See In Re Caere Corporate Secs. Litig., 837 F.Supp. at 1059 (N.D.Cal.1993). Again, plaintiff has failed to meet the pleading requirements to state such a claim. See Fed.R.Civ.P. 9(b); see also In re Time Warner Inc. Secs. Litig., 9 F.3d at 264.
In addition, plaintiff's allegation that "management told Roberts that it was comfortable with consensus earnings estimates of $1.00-$1.05 per share for the 1995 fiscal year" is not actionable as securities fraud. Plaintiff has the burden of pleading sufficient facts to call into question the reasonable basis of defendants' "comfort statements". See In Re HealthCare Compare Corp Secs. Litig., 75 F.3d at 282. Plaintiff has failed to plead such facts. In addition, management's statements of "comfort with an analyst's predictions cannot be deemed actionable" under the standards set forth in Raab. See Malone v. Microdyne Corp., 26 F.3d 471, 479 (4th Cir. 1994). Such statements of "comfort" are not guarantees and are not specific enough to perpetrate a fraud on the market. Id.
The Court will dismiss plaintiff's claims alleged in paragraph 32 of his complaint arising from statements made to W.C. Roberts on or about March 17, 1995 and statements contained in the March 28, 1995 Hilliard analyst report for failure to state a claim.

(6) April 13, 1995 press release (complaint, ¶ 34).
On April 13, 1995, Rawlings issued a press release reporting below-estimate earnings for the second quarter.[16]
"Second quarter results were adversely affected by a decline in gross profit margins, *1161 increased operating expenses and higher interest costs," commented Carl J. Shields, Rawlings' Chairman, Chief Executive Officer and President.
The gross profit margin decreased to 32.9% from 34.1% (on a pro forma basis). "The decrease was due to lower licensing revenue, higher inbound freight expense on a new glove series, and a less favorable sales mix in the baseball product line", Mr. Shields stated. "Selling, general and administrative expenses were up 15.1% or $1.3 million, but some of these expenses involved a compensation and benefit study, a computer conversion project and accounting and tax services which will either disappear or be reduced significantly in the second half." Mr. Shields noted that increased interest costs reflected higher interest rates and higher borrowings.
Plaintiff does not allege that the past financial information was false, but alleges that defendants improperly downplayed the negative financial information because defendants were aware of undisclosed facts tending to seriously undermine the accuracy of the representations  namely the decline in sales and cancellation of orders for baseball-related products. Complaint, ¶ 55.
Plaintiff has made four factual allegations that defendants were aware of the far-reaching effects of the baseball strike as of the time of this press release on April 13, 1995. Plaintiff has alleged that (1) in August of 1994, after the baseball strike was announced, Koenig cut its orders of Rawlings' products by as much as 15%; (2) in January or February of 1995, Sportmart canceled prior orders of Rawlings' products and company representative told Rawlings that business was "shot" and that gloves which had previously been ordered should not be shipped; (3) by February or March of 1995, Paragon observed a noticeable decline in sales of baseball-related merchandise and notified Rawlings that it would not accept some of its advance orders; and (4) no later than April, 1995, Sports Authority notified Rawlings that it would not accept the projected orders it had made earlier in the year  its cancellations of orders were at least 5% and likely much more. Complaint, ¶¶ 45, 48, 55, 51.
The Court finds that plaintiff has pled with adequate specificity the basis for its claim that defendants' improperly downplayed the negative financial information set forth in Rawlings' April 13, 1995 press release. Plaintiff has alleged with sufficient specificity that Rawlings had knowledge regarding undisclosed reasons for the decreased revenue  namely that four Rawlings' customers were experiencing adverse sales due to the baseball strike, those customers had conveyed that information to Rawlings and those customers were cancelling and/or decreasing orders.[17]
The Court will not dismiss plaintiff's claims alleged in paragraph 34 of his complaint arising from Rawlings' April 13, 1995 press release.
Plaintiff further alleges that
defendants continued to insist to analysts  as reflected in an April 19, 1995 Dillon, Read & Co. analyst report  that 10-15 percent top-line growth and 15-20 percent bottom-line growth was not only possible but expected.
Complaint, ¶ 34. Once again, the Court notes Rawlings may only be liable for analysts' forecasts which are "fostered and reviewed but failed to correct if it expressly or impliedly represented that the information was accurate or coincided with the company's views." Elkind v. Liggett & Myers, Inc., 635 F.2d at 163. Again, plaintiff has failed to satisfy the pleading requirements and defendants cannot be liable for the April 19, 1995 Dillon, Read & Co. report. Moreover, defendants' projections of a 10-15% top-line growth and 15-20% bottom line are soft, puffing statements that are not material as a matter of law. See Raab v. General Physics Corp., 4 F.3d at 289 (4th Cir.1993) (finding that predictions of a "10% to 30% growth *1162 rate over the next several years" were not material because the market price of a share is not inflated by "vague statements predicting growth.")
Thus, the Court will dismiss plaintiff's claims alleged in paragraph 34 of his complaint arising from the April 19, 1995 Dillon, Read & Co. report and the statements which defendants made to analysts regarding Rawlings' growth which may have been reflected in that report.

(7) May 22, 1995 press release (complaint, ¶ 35).
On May 22, 1995, Rawlings issued a press release acknowledging consumer dissatisfaction with baseball and a decrease in baseball-related product demand and revenue. The press release stated:
"In March, we estimated fiscal 1995 revenues to be in the neighborhood of $150 million, assuming that fill-in orders from retailers during the last half would be similar to the year ago pace. That clearly is not happening, and therefore we now expect revenues to be approximately $145 million, based in part, on the discussions with major accounts. While the impact of the fans' disaffection with baseball on our business is difficult to quantify, we have anecdotal evidence that youth participation is down substantially." Mr. Shields added, "In light of this revenue shortfall, we anticipate earnings per share for the year to be in the range of $0.80 to $0.85."
Mr. Shields went on to say, "At this point, it would be premature to comment on fiscal 1996. Whenever the negative attitude toward baseball moderates, we are well positioned to meet the demand for baseballs, gloves, bats, helmets and other baseball-related products."
Again, plaintiff alleges that defendants' optimistic statements and assurances were false and misleading because they lacked a reasonable basis when made and defendants were aware of undisclosed facts tending to seriously undermine the accuracy of the representations. Complaint, ¶ 55.[18] Specifically, plaintiff alleges that defendants knew but did not disclose the decrease in orders, the cancellation of orders and the decline in demand for baseball products. Complaint, ¶ 56.
Plaintiff has made four factual allegations that defendants were aware of the far-reaching effects of the baseball strike as of the time of this press release on May 22, 1995. Plaintiff has alleged that in August of 1994, after the baseball strike was announced, Koenig cut its orders of Rawlings' products by as much as 15%; (2) in January or February of 1995, Sportmart canceled prior orders of Rawlings' products and company representative told Rawlings that business was "shot" and that gloves which had previously been ordered should not be shipped; (3) by February or March of 1995, Paragon observed a noticeable decline in sales of baseball-related merchandise and notified Rawlings that it would not accept some of its advance orders; and (4) no later than April, 1995, Sports Authority notified Rawlings that it would not accept the projected orders it had made earlier in the year  its cancellations of orders were at least 5% and likely much more. Complaint, ¶¶ 45, 48, 55, 51.
Although defendants argue that the actions of four of Rawlings' 2,500 customers were not sufficient to put Rawlings' on notice of the far-reaching effect of the strike, the actions of these four customers may be material enough to create a duty to disclose. The Court finds that it would be inappropriate to resolve at this stage whether the information received from the four customers *1163 was sufficiently "material" to create a duty to disclose. See In re 3Com Secs. Litig., 761 F.Supp. 1411, 1417 (N.D.Cal.1990). The Court further finds that it would be inappropriate to resolve at this stage whether defendants' disclosure of adjusted revenue projections based on "discussions with major accounts" constituted a sufficient disclosure of the information in question.
Plaintiff has pled facts with sufficient specificity to show that defendants' disclosures made on May 22, 1995 may have been incomplete and that the predictions regarding revenue may have lacked a reasonable basis. Plaintiff has pled that defendants had knowledge regarding reasons for the decreased revenue that they did not disclose to investors  namely that four Rawlings' customers were experiencing adverse sales due the baseball strike and that this was impacting Rawlings' revenue.
The Court will not dismiss plaintiff's claims alleged in paragraph 35 of his complaint arising from Rawlings' May 22, 1995 press release.

(8) June 30, 1995 press release (complaint, ¶ 36), July 9, 1995 press release (complaint, ¶ 38) and October 26, 1995 press release (complaint, ¶ 39).
On June 30, 1995, Rawlings issued a press release further lowering its earnings estimates. Complaint, ¶ 36. On July 9, 1995, Rawlings issued a press release wherein it reiterated that its revenue and earnings for the quarter ended May 31, 1995 would be substantially lower than previously estimated. Complaint, ¶ 38. On October 26, 1995 Rawlings announced its results of operations for the 1995 fiscal year. Complaint, ¶ 39. Plaintiff has not alleged that any of these statements were fraudulent, but apparently is alleging that the negative disclosures provide a basis for his claims of fraud based on earlier statements and predictions. The Court does not agree. See n. 18. Because plaintiff has not alleged that any statements or predictions in these three press releases were fraudulent, the Court need not analyze the statements any further.

I. Plaintiff's Claim against Keene and Shields under § 20(a)
Defendants' motion to dismiss plaintiff's claim for "controlling person" liability against Keene and Shields under § 20(a) is based in part on the fact that there can be no § 20(a) liability where plaintiff has failed to state a claim under § 10(b) and Rule 10b-5. Because the Court's findings above are that plaintiff has sufficiently stated a claim under § 10(b) and Rule 10b-5 based on certain statements and/or omissions, the Court will not dismiss plaintiff's claims against the individual defendants on this basis.
Moreover, the Court finds that plaintiff has sufficiently pled that Shields and Keene were control persons under § 20(a). Plaintiff's claim against Keene is made in his capacity as Vice President for Foreign Activity and Procurement, Chief Operating Officer and Secretary of Rawlings' Board of Directors. Plaintiff's claim against Shields is made in his capacity as Chairman of the Board of Directors, Chief Executive Officer and President of Rawlings. The Court finds that an individual's mere position as an officer or director does not necessarily make him a control person. Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir.1984). "There must be some actual showing of participation in the corporation's operations or some influence before the consequences of control may be imposed." Id. at 832. The Court further finds that plaintiff has adequately alleged that Keene and Shields actually participated in Rawlings' operations and had influence such that the consequences of control may be imposed. Complaint, ¶¶ 9, 12, 60.
The Court will not dismiss plaintiff's claims against the individual defendants based on liability under § 20(a).

J. Conclusion
Based on the foregoing analysis, and pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), the Court will dismiss plaintiff's claims based on the allegations asserted in ¶¶ 25, 26, 27, 28, 29 and 32 of plaintiff's complaint for failure to state a claim. In addition, pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), the Court will *1164 dismiss plaintiff's claims based on the allegations asserted in ¶ 34 of plaintiff's complaint which attempt to premise securities fraud liability based on statements made to or by securities analysts for failure to state a claim. The Court finds that these claims are not actionable as fraud.
The Court will not dismiss plaintiff's claims based on the allegations in ¶¶ 31 and 35 of plaintiff's complaint or plaintiff's claims based on the allegations asserted in ¶ 34 of plaintiff's complaint arising from Rawlings' April 13, 1995 press release. Moreover, the Court will not dismiss plaintiff's claims against the individual defendants under § 20(a).
Accordingly,
IT IS HEREBY ORDERED that defendants' motion to dismiss is granted in part and denied in part.
IT IS FURTHER ORDERED that defendants' motion to extend limitations on discovery [Doc. # 34] is denied.
NOTES
[1] Although the complaint identified Keene as "Harold B. Keene", the parties agree that defendant Keene is Howard B. Keene.
[2] The remaining statements relate to conferences with and reports issued by securities analysts.
[3] Defendants have attached SEC Form 10-K for the transition period ending August 31, 1994, Rawlings' 1994 annual report and six press releases. Defendants have also attached SEC Form 4 dated January 23, 1995 which is the statement of changes in beneficial ownership for Keene's sale of his 3,230 shares on January 23, 1995.
[4] Plaintiff also alleges that Herman's informed Rawlings that it wanted the ability to cancel orders for merchandise that had not yet been delivered. Even if this information is material, failure to disclose it does not support an inference of fraud since customers already had the ability to cancel orders and Rawlings adequately disclosed this fact to the public. See, e.g., Rawlings Form 10-K filed on August 31, 1994, p. 29 and Rawlings 1994 Annual Report, p. 20. See In re Marion Merrell Dow Inc., Securities Litig., No. 92-0609-CV-W-6, 1993 WL 393810 (W.D.Mo. Oct. 19, 1993) citing In Re Apple Computer Secs. Litig., 886 F.2d 1109, 1115 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) ("in a fraud on the market case, defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources").
[5] Again, plaintiff alleges that Rawlings agreed that Koenig could cancel orders for merchandise that had been ordered in the summer of 1994. Complaint, ¶¶ 44-45. This fact does not support an inference of fraud because the information was already available to the public. See n. 4.
[6] The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77a, et seq., amended the 1934 Securities Exchange Act and made the pleading standards in a securities fraud case more rigorous. See, e.g., 15 U.S.C. § 78u-4(b)(1) & (2). Although defendants refer to the PSLRA, stating that it codified some of the current law's requirements for bringing a class action under Rule 10b-5, the Court finds that the PSLRA, by its own terms, does not apply to this complaint which was filed before the PSLRA's enactment.
[7] Complaint, ¶¶ 61-62.
[8] Although the mere fact of an insider sale of stock creates no inference of fraud, Tapogna v. Egan, 141 F.R.D. 370, 373 (D.Mass.1992) specific allegations of insider trading raise an inference of scienter. In re Network Equipment Technologies, Inc., Litig., 762 F.Supp. 1359, 1362 (N.D.Cal.1991).
[9] This analysis is proper. See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d at 805-06.
[10] Plaintiff has defined the class period as November 8, 1994 through June 30, 1995. Complaint, ¶ 13. Nevertheless, plaintiff has included allegations in his complaint from both before and after the alleged class period. Although liability cannot attach to statements made either before or after the class period, because a class has not yet been certified and a class period not yet defined, the Court will address each of plaintiff's allegations.
[11] Plaintiff's remaining allegations regarding what Rawlings' customers were experiencing either (1) were never conveyed to Rawlings or (2) were not conveyed to Rawlings until after Rawlings' Form 10-K for the transition period ending August 31, 1994 was issued. Thus, these remaining allegations do not support plaintiff's claim that statements made on August 31, 1994 were fraudulent. See In Re HealthCare Compare Corp. Secs. Litig., 75 F.3d at 281 (plaintiff did not explain when or how defendant knew that the information in question was below expected levels, or why the defendant should have been able to process the information prior to the date it did).
[12] Materiality is a mixed question of law and fact, ordinarily left to the finder of fact. The issue of materiality may be decided as a matter of law on a motion to dismiss if the alleged omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 541 (2d Cir.1996). See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d at 810 (affirming a district court's granting of a motion to dismiss under 10b-5 finding that defendant's engaging in test marketing at reduced prices was not significant as a matter of law). Failure to disclose a material decline in orders could be a sufficient omission to state a claim for securities fraud. Here, however, plaintiff has not alleged that there was a material decline in orders as of August 31, 1994. Instead, plaintiff has alleged that defendants failed to disclose that as of August 31, 1994, one of Rawlings' 2500 customers cut back its orders.
[13] Defendants further argue that the predictions regarding the effect of the baseball strike are not actionable under the "bespeaks caution" doctrine because the predictions were accompanied by express underlying assumptions. The Court finds that simply disclosing the factual assumptions which underly the predictions is not sufficient to brings the predictions within the "bespeaks caution" doctrine. To adequately "bespeak caution" the predictions must not only disclose the underlying factual assumptions, but also disclose specific warnings and significant risk factors. See Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 949 F.2d 243, 245-46 (8th Cir.1991).
[14] Defendants have attached a copy of Rawlings' January 12, 1995 press release to their reply memorandum. Presumably, the press release is the basis for the January 13, 1995 conference call which plaintiff refers to in ¶ 29 of his complaint. Nonetheless, plaintiff alleges that fraudulent statements were made in the January 13, 1995 conference call, not the January 12, 1995 press release. Accordingly, the Court will not consider the January 12, 1995 press release in ruling on defendants' motion to dismiss.
[15] Plaintiff claims that the Court may "properly infer that the declining sales, canceled orders and decreased demand experience by the stores identified in the Complaint were likewise experienced by most if not all of Rawlings' other customers." Pltf.Mem. in Opp., p. 13, n. 5. Although the Court construes the allegations of the complaint and reasonable inferences arising therefrom favorably to plaintiff, the Court need not and will not adopt inferences that are unsupported by the facts set out in the complaint.
[16] Plaintiff alleges that this press release is not actionable because it occurred after plaintiff completed his last purchase of Rawlings' stock on March 17, 1995 and thus, plaintiff cannot show reliance. Because plaintiff is proceeding under a fraud on the market theory, this argument is unpersuasive.
[17] Defendants argue that this nondisclosure of an "industry wide trend" cannot be the basis for securities fraud. See Whirlpool Financial Corp. v. GN Holdings, 67 F.3d 605, 609 (7th Cir.1995). The Court finds that plaintiff has not made allegations stemming from an industry wide trend, but has made allegations that defendants knew that the baseball strike was specifically effecting Rawlings' sales, revenues and profitability.
[18] Plaintiff argues that defendants' ultimate disclosure of adverse information provides a basis for his allegations of securities fraud based on earlier predictions. The Court does not agree. Mere disclosure of bad news does not warrant an inference that defendants knew the bad news at an earlier date. See Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1419 (7th Cir.1992) ("such an inference is unreasonable"); see also Arazie v. Mullane, 2 F.3d at 1467-68 ("temporal proximity between positive statements stressing firms' strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent"); see also DiLeo v. Ernst & Young, 901 F.2d 624, 627-28 (7th Cir.1990), cert. denied, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) ("because only a fraction of financial deterioration reflect fraud, investors must point to some facts suggesting that the difference is attributable to fraud").