**In re STAFFMARK, INC. SECURITIES LITIGATION.**

**This Document Relates to All Cases.**

**No. 499CV00172GTE.**

United States District Court,
E.D. Arkansas,
Western Division.

June 29, 2000.

On Motion for Partial Reconsideration
Nov. 22, 2000.

G. Paul Howes, Debra J. Wyman, Kirk B. Hulett, Milberg, Weiss, Bershad, Hynes & Lerach, Jeffrey R. Krinsk, Finkelstein & Krinsk, San Diego, CA, David R. Scott, Scott & Scott, LLC, Colchester, CT, Steven Eugene Cauley, Scott E. Poynter, Gina Michelle Cothern, Cauley & Geller, LLP, Little Rock, AR, for John A. Jennen, on behalf of himself and all others similarly situated, Steven R. Engorn, StaffMark Plaintiffs Group, Philip Culver Evans, StaffMark Plaintiffs Group, plaintiffs.

M. Samuel Jones, III, Wright, Lindsey & Jennings, Little Rock, AR, Marc J. Sonnenfeld, Karen A. Pieslak Pohlmann, Elizabeth Hoop Fay, Morgan, Lewis & Bockius LLP, Philadelphia, PA, James D. Zirin, Brown & Wood, New York, NY, for StaffMark Inc., Clete T. Brewer, Robert Walters, defendants.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

Before the Court is Defendants' Motion to Dismiss. Plaintiffs have responded to Defendants' Motion, and the Court is prepared to rule. For the reasons set out below, the Court will grant in part and deny in part said Motion.

## I. Background

In their Consolidated Complaint, Plaintiffs bring claims pursuant to § 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission (the "SEC"), and pursuant to § 20(a) of the aforementioned 1934 Act. In it, Plaintiffs allege the following. Defendant StaffMark is a company which provides diversified staffing, professional, and consulting services to businesses, professional and service organizations, medical niches, and government agencies. Between February 3, 1998, and March 2, 1999 (the "Class Period"), the Company made three to four acquisitions per quarter, which more than doubled the Company's revenue, and, by late October, 1998, it had 220 offices in 30 states and 11 countries worldwide.

In order to allay concern about whether StaffMark could continue its aggressive pace, the Defendants gave numerous written and verbal assurances to investors, and commented that the Company's stock was undervalued.[1] However, during the fourth-quarter of 1998, StaffMark experienced a slowdown in several of its divisions. After this downturn, the Company recorded poor results in January of 1999, posting 0% revenue growth in its IntelliMark division, formerly its most profitable, when it had a planned growth of 18–20%. The next month, Defendant Clete Brewer, StaffMark's Chief Executive Officer, continued to represent that the Company's sales were increasing. However, at the end of the Class Period, StaffMark admitted that it was having difficulty integrating its numerous acquisitions, that it did not have the proper infrastructure in place to facilitate its growth, and that it would halt its aggressive acquisition plan. After these revelations, StaffMark's stock tumbled 35% in one day.

## II. Motion to Dismiss Standard

In deciding a motion to dismiss, a court must view the facts alleged in the complaint in the light most favorable to the plaintiffs. *Toombs v. Bell*, 798 F.2d 297, 298 (8th Cir.1986). A complaint should not be dismissed unless it appears that plaintiffs could prove no set of facts in support of their claim which would entitle them to relief. *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). The Court must construe the complaint in favor of the pleader, and it must accept as true factual allegations made in the com-

---

1. The specific allegations of Plaintiffs' Complaint concerning Defendants' alleged misrepresentations will be addressed in detail below.

plaint. *Kenevan v. Empire Blue Cross & Blue Shield,* 791 F.Supp. 75 (S.D.N.Y. 1992). However, where the Court concludes that the pleadings do not, as a matter of law, set forth facts sufficient to state a claim upon which relief may be granted, the Court should grant the defendant's motion to dismiss.[2]

## III. Pleading Requirements under § 10(b) and Rule 10b–5

■ To prevail on a claim brought pursuant to § 10(b) and Rule 10b–5, plaintiffs must show that (1) the defendants made material misrepresentations or omissions of material fact; (2) the defendants acted with scienter; (3) the plaintiffs relied on defendants' misrepresentations or omissions to their detriment; and (4) the allegedly fraudulent conduct caused the plaintiffs to purchase securities and caused the plaintiffs' economic harm. *In re BankAmerica Corp. Sec. Litig.,* 78 F.Supp.2d 976, 989–990 (E.D.Mo.1999). In the instant case, Defendants attack Plaintiff's Complaint as deficient on numerous grounds, the first being that it does not raise a strong inference that Defendants acted with scienter as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

### A. The PSLRA

Even Prior to the enactment of the PSLRA, a plaintiff bringing a claim under § 10(b) and Rule 10b–5 was required to plead fraud with sufficient particularity as commanded by Federal Rule of Civil Procedure 9(b). *Parnes v. Gateway 2000,* 122 F.3d 539, 549 (8th Cir.1997). The Eighth Circuit noted that "conclusory allegations that a defendant's conduct was fraudulent and deceptive [were] not sufficient to satis-

fy the rule." *Commercial Property Invs., Inc. v. Quality Inns Int'l., Inc.,* 61 F.3d 639, 644 (8th Cir.1995). As to the scienter requirement, the Eighth Circuit held that it could be established by proof of knowing or intentional practices to deceive, manipulate, or defraud. *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1534 (8th Cir. 1996). In addition, this Circuit followed the majority rule that recklessness, in the nature of stating untrue facts with reckless disregard for their falsity, was also sufficient to demonstrate scienter. *Id.*

When Congress passed the PSLRA, it attempted to "deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 974 (9th Cir. 1999). While Congress may have achieved this stated goal to a degree, it has not done so without abundant litigation analyzing the proper interpretation of the new standards. At least six circuits have addressed the question of whether and, and, if so, to what extent, the PSLRA heightened the standard for determining when alleged facts satisfy the scienter requirement of a cause of action under § 10(b) and Rule 10b–5. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185 (1st Cir.1999); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271 (11th Cir.1999); *In re Silicon Graphics Sec. Litig.,* 183 F.3d at 970; *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542 (6th Cir.1999); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525 (3d Cir.1999); *Press v. Chemical Inv. Serv. Corp.,* 166 F.3d 529 (2d Cir.1999). However, the Eighth Circuit is not among them.

Because any interpretation of a statute begins with its plain language, the relevant

---

2. In ruling on this Motion, the Court considered some material, such as stock purchases made by Defendant Brewer and transcripts of conference calls, which is not contained in the Consolidated Complaint. Normally, such consideration would transform a motion to dismiss for failure to state a claim into a motion for summary judgment. *Parnes v. Gateway 2000,* 122 F.3d 539, 546 n. 9 (8th Cir.1997). However, a court may consider, when deciding a motion to dismiss, unquestionably authentic documents so long as some of the plaintiff's claims are based on those documents. *Id.* In addition, material part of the public record which does not contradict the complaint may be taken into account at the judgment on the pleadings stage. *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir.1999).

portions of the PSLRA, codified at 15 U.S.C. § 78u–4(b)(1)–(2), read:

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Circuit courts addressing the PSLRA's effect on scienter pleading have divided in three basic ways.

Comprising the first group are the Second and Third Circuits, and these two circuits hold to the opinion that the PSLRA essentially codified the Second Circuit's pre-PSLRA requirement of pleading scienter in a § 10(b) and Rule 10b–5 action. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d at 534; *Press,* 166 F.3d at 537–38. To sufficiently plead scienter in that circuit, a plaintiff must either have (1) alleged facts to show that defendants had both motive and opportunity to commit fraud, or (2) alleged facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* at 538. For its part, Congress certainly considered the Second Circuit's pleading standard in passing the PSLRA, although the legislative history on whether Congress intended to adopt this standard is "ambiguous and even contradictory." *In re Advanta Corp. Sec. Litig.,* 180 F.3d at 531. The Senate Report accompanying its resolution illustrates this ambivalence:

The Committee does not adopt a new and untested pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modeled upon the pleading standard of the Second Circuit.... [T]he Second Circuit requires that the plaintiff plead facts that give rise to a "strong inference" of defendant's fraudulent intent. The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.

*Greebel,* 194 F.3d at 194 (quoting S. Res. 98, 104th Cong., at 15 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694 (footnotes omitted)).

Taking a more restrictive view, the Ninth Circuit has held that the PSLRA was intended to heighten the standard for scienter above that set out by the Second Circuit. *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d at 979. After an extensive review of the legislative history of the Act, the court concluded:

It follows that plaintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere "motive and opportunity" or "recklessness," but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent. Thus, we agree with the district court that the PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness.

*Id.*

The final of the three interpretations employed by the circuits most clearly

tracts the plain language of the PSLRA. In short, the First, Sixth, and Eleventh Circuits have found that the PSLRA did not intend to change the manner courts determine what constitutes scienter, such as by adopting the Second Circuit's two prong test to include "motive and opportunity," or by heightening the standard to require the pleading of "deliberate or conscious recklessness" as the Ninth Circuit has held, but, instead, requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Following the language of the statute, the Sixth Circuit concluded that "plaintiffs may plead scienter in § 10(b) and Rule 10b–5 cases by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud." *In re Comshare Inc., Sec. Litig.*, 183 F.3d at 549. Likewise, the Eleventh Circuit held that a "plaintiff must plead with particularity facts which give rise to a strong inference that the defendant acted in a severely reckless fashion— 'the required state of mind' in our Circuit for many years." *Bryant*, 187 F.3d at 1286. Finally, the First Circuit determined that the PSLRA "does not change the pre-existing definition of scienter adopted by this circuit," and tested the plaintiffs' complaint against its pre-PSLRA interpretation. *Greebel*, 194 F.3d at 201.

█ The Court is convinced that the interpretation propounded by the First, Sixth and Eleventh Circuits is the correct one. While the legislative history of the Act is replete with discussions of the Sec-

ond Circuit's then considered restrictive view of pleading scienter in § 10(b) and Rule 10b–5 complaints, examination of legislative history when interpreting a statute is not necessary when the plain language of the text is clear. *Bryant*, 187 F.3d at 1284. The PSLRA makes no mention of changing in any way the level or type of scienter required in a securities fraud case, but rather commands a plaintiff to state "with particularity" a "strong inference" of such scienter. Plainly, there is no change to the "required state of mind." As the First Circuit noted, "the debate about adoption or rejection of prior Second Circuit standards strikes us as somewhat beside the point." *Greebel*, 194 F.3d at 196. Therefore, this Court will examine the Plaintiffs' Complaint to determine if they have alleged specific and particular facts which create a strong inference that the Defendants acted with "the required state of mind" in the Eighth Circuit, which, as mentioned above, is, at a minimum, a form of recklessness. *Alpern*, 84 F.3d at 1534 (noting recklessness exists where defendants state untrue facts with reckless disregard for their truth or falsity).

## B. Plaintiff's Allegations

After thoroughly reviewing the allegations contained in Plaintiffs' Complaint, some initial observations and rulings are required. First, there is merit in Defendants' contentions that the Complaint sets out its allegations in a somewhat rambling format which makes review difficult. The portions of the Complaint which outline allegedly false and misleading statements made during the Class Period[3] are lumped together into groups of quotes and excerpts from reports several paragraphs long, only then setting out the alleged facts which purportedly disprove them.[4] In the

---

3. See Plaintiffs' Consolidated Complaint, ¶¶ 32–70.

4. Numerous courts have encountered this problem in securities fraud actions. *See Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1244 (N.D.Cal.1998) ("In violation of the Reform Act's requirement that a complaint must

specify the reasons why each statement is alleged to have been misleading, the Complaint lumps all alleged misrepresentations together in one unwieldy 14–page segment ... and then follows that catalog with a three-page laundry list of reasons why all the statements were allegedly false when made."); *May v. Borick*, 1997 WL 314166, *8

process, it is sometimes left to the reader to ascertain which "fact" disproves a referenced statement, which obviously lessens the force of Plaintiffs' allegations.[5]

Secondly, the Court concludes that the Plaintiffs have stated with sufficient particularity the time, place, and contents of the alleged false representations, as well as the identity of the person speaking it, as was required in this Circuit pursuant to Federal Rule of Civil Procedure 9(b), and which is still required under the PSLRA. *See* 15 U.S.C. § 78u–4(b)(1) ("the complaint shall specify each statement alleged to have been misleading. . . ."). However, that does not end the Court's inquiry. Under the PSLRA, a plaintiff also must outline "the reason or reasons why the statement is misleading," or, stated otherwise, the plaintiff's basis for believing a statement was false. *Id.* Additionally, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* Finally, if a plaintiff is able to state with particularity that a statement was made and outline the reasons why that statement was false, a plaintiff still must set out specific facts which give rise to a "strong inference" that the defendant acted with scienter when he made that statement, or, in the Eighth Circuit, with knowledge of its falsity or reckless disregard for the truth. 15 U.S.C. § 78u–4(b)(2).

■ We turn now to the specific allegations contained in paragraphs 32–70 of Plaintiffs' Consolidated Complaint. While many of those allegations are more in the nature of background information, there are some which require more in-depth consideration:

Paragraph 33: In March or early April 1998, StaffMark mailed its 1997 Annual Report to shareholders, which included a letter from Brewer which stated that the Company's "focus on integration and adding value has allowed our acquisitions to have a smooth transition into the StaffMark family. Our integration team works closely with all acquisitions to ensure a successful and seamless conversion."

Paragraph 40: On July 29, 1998, The Arkansas Democrat–Gazette published an article in which Brewer was quoted as saying that he saw no problem with continuing the Company's rapid pace of acquisitions.

Paragraph 43: On September 5, 1998, The Arkansas Democrat–Gazette reported that StaffMark's stock price had been declining over the past several weeks and reported that Robert James, StaffMark's executive vice president for acquisitions, said that if the stock remains undervalued the firm will pay more cash in future acquisitions: "We're doing the things to make sure we have plenty of powder to make acquisitions. I would not see us slowing down."

---

(C.D.Cal. March 3, 1997) ("[The complaint's] organization obfuscates rather than clarifies. Plaintiff's failure to address defendants' allegedly misleading statements individually, or even by category, and to state why each statement, or category of statements is misleading, renders this Court's task, and the task of the defendants, excessively difficult."); *Shuster v. Symmetricom, Inc.,* 1997 WL 820967, *1 (N.D.Cal. June 25, 1997) ("The Complaint as it now stands is a rambling set of allegations which is almost impossible to effectively review. . . . Plaintiff sets forth lengthy quotes from various releases by defendants' officers and a securities analyst but does not make clear what portion of each quote constitutes a false representation."); *Strassman v. Fresh Choice,* 1995 WL 743728, *4 (N.D.Cal. Dec.7,

1995) ("The FAC's deficiencies do not stem simply from its length, but rather from its requirement that the reader find the needle in the haystack.").

**5.** The Court understands Plaintiffs' position that a technically true statement can still be used to mislead if the truth given is only partial or if truthful representations of minor accomplishments are used to conceal the inevitability of the much larger impending doom. *See McMahan & Co. v. Wherehouse Entertainment,* 900 F.2d 576, 578 (2d Cir. 1990). However, nothing prevents Plaintiff from outlining more precisely which statements are actually false and which may be true but were nevertheless used to mislead.

Paragraph 44: On October 8, 1998, StaffMark issued a press release over the PR Newswire announcing that its Board had approved a $10 million buy back of common stock. Brewer reiterated the Company's view that its stock was undervalued.

The Board's action expressed our confidence in the strength of StaffMark' business and our expectations for the future. Based on StaffMark's track record of successful growth and our expectation for continued growth, we currently view our shares as undervalued and not reflecting StaffMark's long-term value. StaffMark's officers and directors have a significant investment in the Company's shares and several have recently purchased Staff-Mark stock underscoring our strong confidence in the future.

Paragraph 46: On October 20, 1998, Brewer hosted a conference call in which he stated that because StaffMark's share price had declined below its fair value, the Company would only acquire companies for cash and that StaffMark had the management team in place to assimilate and execute its acquisition strategy. In addition, he stated that StaffMark would achieve $1.86–$1.90 earnings per share in 1999.

Paragraph 49: On October 28, 1998, during an interview conducted by the Wall Street Transcript, Brewer stated that on "a typical transaction, about 80 percent of the consideration we pay is in cash, and the other 20 percent is generally in stock. . . ." He went on to note "we have no problems continuing our growth. . . ."

Paragraph 53: On November 30, 1998, StaffMark issued a press release over the PR Newswire to announce that it had completed the Robert Walters plc acquisition for 6,690,000 shares of Staff-Mark, valued at approximately $140 million (this stock-for-stock transaction had been agreed to on August 18, 1998).

Paragraph 54: In connection with the November 30, 1998, press release, Staff-Mark hosted a conference call with cer-tain analysts in which Brewer stated that StaffMark's acquisition pipeline remained full, the Company would grow its earnings at 20–25% annually over the next 3–5 years, and would earn $0.35–0.36 per share in first quarter 1999 and $1.86–1.89 per share for the year.

Paragraph 57: In connection with a February 4, 1999, press release, Staff-Mark hosted a conference call with certain analysts in which Brewer made the following contentions:

The weakness StaffMark's growth experienced in fourth-quarter 1998 was waning and the Company continued to experience superior growth within the staffing industry despite its assimilation of acquired companies; and

StaffMark would continue to grow its earnings at 20–25% over the next 3–5 years; and, as a result, StaffMark would earn $0.34–0.35 and $1.86–1.89 in first-quarter 1999 and for the year, respectively.

Paragraph 58: On February 8, 1999, Brewer responded to an e-mail sent by lead plaintiff John Jennen, as to the identity of the seller of 250,000 Staff-Mark shares. Brewer replied via e-mail: "Don't know who the seller was. We are buyers at these prices."

Paragraph 59: On or about February 24, 1999 (just six days before announcing its earnings per share were to be significantly lower than expected), Brewer and other StaffMark officials made the following representations to a securities analyst:

StaffMark's operations were strong and performing according to plan;

They were confident in the strength of the Company's operations;

While December of 1998 and early January of 1999 business had been slow, the Company's business was ramping up as fast or faster than expected; and

As a result, they were confident that StaffMark would earn $0.35 for first

quarter 1999, and $1.86–1.93 for the year.

These allegations, obviously, are not the only ones contained in Plaintiffs' Complaint, but, in the Court's view, they are the only ones which could arguably be actionable. The remainder of Plaintiffs' allegations are simple recitations of facts about the Company's past performance,[6] or are vague statements made by Defendants in anticipation and hope of future performance.[7]

After reviewing the entirety of Plaintiff's allegations, the Court believes that the complained of public statements can be conveniently grouped into three basic categories: 1) the Defendants represented that their numerous acquisitions were being or had been assimilated smoothly into the company and that they had the proper infrastructure to ensure the adequate management of their rapid growth; 2) the Defendants represented that their company was performing above expectations and that their earnings would rise to a certain level; and 3) the Defendants represented that the Company's stock was undervalued.

### 1. *Assimilation and Infrastructure*

■ First, Plaintiffs assert that Defendants violated § 10(b) and Rule 10b–5 when they claimed to have the proper infrastructure in place to handle their aggressive acquisition policy, and that their corporate acquisitions were being successfully assimilated into the Company. *See* Plaintiffs' Consolidated Complaint, ¶¶ 33, 40, 46, 49, and 53. Plaintiffs are correct that, in fact, the Defendants were having difficulty assimilating their acquisitions.

In late March of 1999, StaffMark executives admitted the same and admitted that their management structure was not as strong as was needed to handle StaffMark's rapid expansion. Plaintiffs' Complaint, ¶¶ 62 and 68. Therefore, by StaffMark's own admission, the statements made were incorrect. However, that does not lead necessarily to a finding of actionable fraud.

Under the PSLRA, in addition to pleading with particularity that a statement was made and that the statement was false, the Plaintiffs must set out with specificity facts which give rise to a "strong inference that the defendants acted with the required state of mind," or, at a minimum in this circuit, recklessness. 15 U.S.C. § 78u–4(b)(2). Plaintiffs recitation of the "true facts," as related to the problems StaffMark was having with assimilation and with infrastructure, is as follows:

> Paragraph 48(a): StaffMark did not have in place the proper and necessary infrastructure to manage and control its business, growth, and integration of acquisitions.

> Paragraph 60(n): StaffMark's decentralization management structure was failing to remedy growth and lack of focus problems the Company was then experiencing.

This is apparently Plaintiffs' attempt at meeting the PSLRA's scienter requirement. However, these conclusory allegations do not come close to setting out with particularity facts giving rise to a strong inference that Defendants acted with reckless disregard for the truth by making the referenced statements concerning the

---

**6.** The Plaintiffs do not contend that StaffMark's announcements concerning its past performance were inaccurate. It has been held, and it is this Court's belief, that "defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy." *In re Marion Merrell Dow Inc., Sec. Litig. II*, 1994 WL 396187 (W.D.Mo. July 18, 1994). As noted by the Court above, Plaintiffs' contention appears to be that the Defendants used these truthful accounts of former

prosperity to obscure their present and soon-to-be inadequacies. However, that allegation pertains more to alleged omissions, not fraudulent statements, and the Defendant's alleged omissions will be discussed at greater length below.

**7.** Such general statements of "optimism" are mere "puffery" which cannot form the basis for § 10(b) and Rule 10b–5 liability. *Jakobe v. Rawlings Sporting Goods Co.*, 943 F.Supp. 1143 (E.D.Mo.1996).

Company's assimilation and infrastructure. Although Plaintiffs do make some allegations regarding StaffMark's decreasing profitability in a number of their divisions, such an economic downturn could be caused by a multitude of factors. Stated otherwise, the fact that the Company may have been struggling in some areas does not give rise to a strong inference that the Defendants must have known, or were reckless in not knowing, that StaffMark was having difficulty assimilating its new acquisitions, or that its management was not up to such a task. Indeed, "[a]llegations are inadequate to indicate conscious behavior on the part of defendant when the 'complaint contains no assertion of any fact that makes it reasonable to believe that the defendants knew that any of their statements were materially false or misleading when made.'" *Jakobe*, 943 F.Supp. at 1154 (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1069 (5th Cir.1994)). Therefore, the Court concludes that Plaintiffs' claims based upon any purported fraud regarding the assimilation and infrastructure statements are not actionable and may not be used as predicates for recovery.

### 2. *Representations of Good Performance, Future Earnings*

Secondly, Plaintiffs allege that Defendants fraudulently misled the market with a myriad of positive statements about StaffMark's future performance, and by announcing their more specific predictions of future earnings. Plaintiffs' Complaint, ¶¶ 43, 44, 46, 54, 57, and 59. Of note is the allegation that, in connection with a February 4, 1999, press release, Brewer represented to a number of analysts that the weakness of StaffMark's growth experienced in fourth quarter 1998 was waning. Plaintiffs' Complaint, ¶ 57. Also, just six days prior to announcing that the Company would report disappointing first quarter 1999 earnings, Brewer and other StaffMark officials represented that the Company's operations were performing strong and according to plan, and that, while December 1998 and January 1999 business had been slow, overall "business was ramping up as fast or faster than expected." Plaintiffs' Complaint, ¶ 59. Most particularly, Defendants represented, up until February 24, 1999, that the Company would earn $0.34 to $0.35 per share for the first quarter of 1999, and between $1.86 to $1.93 per share for the year. Plaintiffs' Complaint, ¶ 59. However, on March 2, 1999, the Company revised these figures to first quarter earnings of $0.22 to $0.25 per share and yearly earnings of $1.65 to $1.69, causing StaffMark's stock price to drop dramatically.

The Plaintiffs suggest that the following show that the Defendants knew or were reckless in not knowing that the statements they made were false:

Paragraph 60(c): StaffMark's rate of earnings growth was slowing because of the Company's inability to provide sufficient employees to meet its clients' demands.

Paragraph 60(h): StaffMark's division and regional managers received weekly statistics or "stats" sheets which reflected hours billed, billing rates and profit margins branch by branch; moreover, a monthly profit-and-loss report was sent to them during the first week of the month and reflected the Company's actual performance for the previous month as against the budget; thus, defendants had known since early 1998 on a weekly basis that StaffMark was suffering a profitability decline in several of its key business segments such as the Georgia Region (Commercial division), Structured Logic Co. (IntelliMark division), Strategic Legal Resources (Professional division), and ClinForce, LLC (Professional division), and was not meeting its budget for revenue and earnings growth of 18%–20% without acquisitions and 30% with acquisitions.

Paragraph 60(i): Because several recent acquisitions failed to meet Company budgets ... Brewer convened a November 1998 meeting in Fayetteville of all division, regional, and business segment

managers to devise a recovery strategy for going forward.

Paragraph 60(j): Several of StaffMark's principal business segments—Commercial, Financial, Permanent Placement, and Information Technology (IntelliMark) services—were experiencing slowing growth rates. In fact, as the Company later admitted in the Spring of 1998, IntelliMark's growth had slowed dramatically in the fourth quarter of 1998 and the results in January 1999 were extremely disappointing. Whereas during the first three quarters of 1998, IntelliMark had 15–20% growth, by the fourth quarter it was only 13% and in January the growth rate was in single digits.

Paragraph 60(*l*): The "Asian Flu" which adversely affected the financial markets in August and September 1998, had resulted in a hiring freeze on Wall Street and in London, adversely impacting StaffMark's business in the U.S. and abroad.

Paragraph 60(m): Strategic Legal Resources ... and Progressive Resources ... two of 11 businesses acquired by StaffMark through the second-quarter 1998, on top of 19 acquired in 1997— failed to meet their monthly budget numbers through the end of 1998.

Paragraph 60(*o*): StaffMark's key IntelliMark division had not experienced any growth in January 1999, versus expected growth of 18–20%, and grew only 4–5% in February 1999, versus budgeted growth of 18–20%.

Generally, courts rarely impose liability on companies for projections or predictions of future performance. This is so in order to encourage companies to make public predictions to assist investors attempting to estimate the future value of a corporation. *See Arazie v. Mullane,* 2 F.3d 1456, 1465 (7th Cir.1993). Also, as a practical matter, such predictions are almost invariably wrong. The Fourth Circuit explained it thusly:

If a company predicts twenty-five percent growth, that is simply the compa-

ny's best guess as to how the future will play out. As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five. If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

*Raab v. General Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993).

■ While the goal of the securities laws is certainly not to discourage the dissemination of information, it is also not their aim to allow companies to wildly boast of future economic profits that have no basis in fact. Therefore, a claim related to a company's predictions of future performance is actionable if the plaintiffs allege sufficient facts tending to show that the defendants made the projections without a reasonable basis, or that the defendants did not genuinely believe the statements, or that the speaker was aware of undisclosed facts which undermined the accuracy of the projections. *In re Marion Merrell Dow,* 1994 WL 396187 at *4 (citing *Arazie,* 2 F.3d at 1466, and *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989)).

Defendants argue that Plaintiffs have not pled scienter with the requisite degree of particularity which is required by the PSLRA. In support of this, Defendants cite a number of cases which hold that vague references to internal reports are insufficient to create a strong inference of fraud. *See In re BankAmerica,* 78 F.Supp.2d at 994; *Head v. NetManage, Inc.,* 1998 WL 917794 (N.D.Cal. Dec.30, 1998). In this case, Plaintiffs have alleged that Defendants' division and regional managers received, from the beginning of

1998, "stats" sheets which identified profit margins for each branch of the Company, and that these sheets showed a profitability decline in four of StaffMark's major business segments: Georgia Region, IntelliMark, Strategic Legal Resources and ClinForce, LLC. Plaintiffs' Complaint, ¶ 60(h). Also, Plaintiffs state that:

> Company managers received weekly and monthly financial reports prepared by the financial department, under the guidance of CFO Terry Bellora, as well as other written and oral reports from members of management, including divisional managers.... Additionally, key management personnel in all divisions and departments received a monthly profit-and-loss report that was sent from corporate headquarters and was received during the first week of each month and reflected the division's and department's performance for the preceding month.

Plaintiffs' Complaint, ¶ 24. Plaintiffs assert that because Defendants received these "stats" sheets, profit-and-loss reports, and weekly and monthly financial reports, they knew of the weaknesses in four key divisions, the Georgia Region, Strategic Legal Resources, ClinForce, and, especially, IntelliMark, where the growth rate had slowed from 15–20% to 13% in the last quarter of 1998, and, by January of 1999, had fallen into single digits. Plaintiffs' Complaint, ¶ 60(j). Therefore, Plaintiffs contend, the complained of representations that StaffMark's business was "ramping up fast or faster than expected," and that the Company would earn $0.34 to $0.35 per share for the first quarter of 1999, and between $1.86 to $1.93 per share for the year were made with the required degree of scienter.

After reviewing Plaintiffs' Complaint, the Court concludes, with some hesitation, that it cannot state that it does not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," with regard to the Defendants' predictions of future performance. Plaintiffs have identified with significant particularity reports which allegedly showed the Company's declining economic prospects. 15 U.S.C. § 78u–4(b)(2). In the face of this, the Defendants, as late as February 24, 1999, just six days prior to announcing that the Company's projected earnings would be significantly below expectations, represented that business was picking up and earnings would meet previous goals. If the Plaintiffs' allegations are true, which the Court must assume in deciding a Motion to Dismiss, a strong inference of scienter would exist, particularly as to the last few statements made during the class period.

■ Defendants also contend that their statements regarding StaffMark's plans, expectations, and market position are "forward looking," and, as such, are protected by the PSLRA's "safe harbor" provision and the "bespeaks caution" doctrine. The PSLRA's "safe harbor" shields defendants from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i).

Clearly, the Defendants' specific projections of earnings, recited in paragraphs 46, 54, 57, and 59 of Plaintiffs' Complaint, are forward looking statements as defined by the PSLRA.[8] *See* 15 U.S.C. § 78u–5(i)(1)(A). With respect to the conference calls cited by Plaintiffs in paragraphs 46 and 57, Defendants attached transcripts which show Defendant Brewer making what they argue are cautionary statements at the beginning of both conference calls: "This conference call discussion may include some forward-looking statements which involve risk and uncertainties

---

**8.** The Court does not consider "forward looking" Defendants' alleged statement of February 24, 1999, that business "was ramping up fast or faster than expected." This is more correctly viewed as a statement of current performance, not future.

**1172**

with respect to growth opportunities and their impact to 98–99 earnings. Actual results may differ materially from those discussed in the forward-looking statements as a result of risk factors set forth in the Company's proxy statement and 10K." Defendants' Exhibits, Nos. 14, 18. The Defendants also attached its 1997 Prospectus in which it outlined risk factors which might influence the Company's performance. Defendants' Exhibit, No. 19.

Significantly, the Defendants' have not cited any cautionary language which may have accompanied the earnings predictions allegedly made and cited by Plaintiffs in paragraphs 54 and 59 of their Complaint. In addition, the Defendants' purported cautionary language does not address Plaintiffs' argument here that Defendants failed to disclose their declining economic growth while continuing to make glowing predictions of future success. Also, the fact that Defendants' included risk factors in its 1997 Prospectus would not qualify as language accompanying earnings predictions made in late 1998 and 1999.[9] Therefore, the Court disagrees with the Defendants' argument that all of its "forward looking" statements of future performance were immunized by significant cautionary language.[10]

■ Lastly, Defendant argues that stock purchases made by Defendants Brewer and StaffMark within the Class Period affirmatively disprove any inference of scienter. Defendants point out that Brewer and his wife bought, through the open market and by exercising stock options, 14,500 shares of StaffMark stock during the Class Period, increasing their total holdings to 1,011,584 shares. Also, the Defendants claim that StaffMark purchased over $2 million of its stock during this time. Defendants cite cases which have held that buying stock during the class period lessens the likelihood of scienter. *See Mathews v. Centex Telemanagement, Inc.* 1994 WL 269734, at *8 (N.D.Cal. June 8, 1994); *Oppenheimer v. Novell, Inc.,* 851 F.Supp. 412, 417 (D.Utah 1994). This Court accepts that such purchases do lessen the likelihood of scienter and might persuade the trier of fact that there was no fraudulent intent. However, at the pleading stage, the Court must determine if such purchases completely negate the possibility of required scienter.

Plaintiffs argue that Brewer's purchases, which amount to only 0.0145% of his total shares owned, are immaterial in amount and do nothing to negate scienter in this case. Also, Plaintiffs contend that StaffMark's filings do not indicate that such a purchase was actually made by the Company, and they dispute that it occurred within the Class Period. Even if StaffMark did buy back this stock, Plaintiffs assert that in October of 1998, the Company claimed it would buy back $10 million of its stock. Therefore, Plaintiffs argue, StaffMark's failure to follow through on this pledge shows that it was aware of difficult times ahead.

The Court agrees with Plaintiffs that the purchases do not affirmatively and completely negate scienter in this case. This

**9.** The Court similarly dismisses Defendant's argument that the judicially created "bespeaks caution" doctrine applies to its "forward looking" statements of future performance in this instance. The Eighth Circuit has held that, for the "bespeaks caution" doctrine to apply, the "cautionary language must 'relate directly to that by which plaintiffs claim to have been misled.'" *Parnes,* 122 F.3d at 548 (quoting *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 371 (3d Cir. 1993)). Defendants have not identified language which directly relates to Plaintiffs' assertion that Defendants knew of StaffMark's declining growth but maintained their optimistic predictions.

**10.** Defendants also point out that, in order for a "forward looking" statement to be actionable, it must be made with actual knowledge that the statement was false and misleading. 15 U.S.C. § 78u–5(c)(B). However, the Court has already determined that Plaintiffs' have met the PSLRA's scienter pleading requirement, which includes actual knowledge or reckless indifference to the truth, and now finds that Plaintiffs have stated sufficient facts to defeat a motion to dismiss on this point.

is not because the Brewers' purchases were relatively small compared to their total holdings for, after all, they did not sell any of their very large holdings. Nevertheless, this does not completely negate the inference of scienter. In addition, the Court will not take into account any alleged buy-back by StaffMark of its stock, because it remains Plaintiffs' contention, as they relate in their Complaint, that no stock was purchased by the Company in the Class Period, and the Court must assume that is correct at this stage in the proceedings.

### 3. Stock Undervalued

■ Finally, Plaintiffs aver that Defendants committed actionable fraud when they announced their belief that StaffMark's stock was undervalued.[11] Plaintiffs' Complaint, ¶¶ 43, 44, 46, and 58. However, even if the Defendants knew or were reckless in not knowing that StaffMark's stock was not undervalued when the statements were made, which is something the Plaintiffs have not pled with particularity as is required under the PSLRA, it is difficult to imagine such a statement having a material effect on a reasonable investor. While materiality is often a jury question, "[w]here a reasonable investor could not have been swayed by an alleged misrepresentation . . . a court may determine, as a matter of law, that the alleged misrepresentation is immaterial." *Parnes*, 122 F.3d at 546. In this case, the Defendants are credited with making such comments as "we currently view our shares as undervalued," and "StaffMark's share price ha[s] declined below its fair value," and "we are buyers at

these prices." However, any investor tuning into a cable business program on any given day would hear the same or similar comments being made by some corporate executive touting the strength of his company and the bargain price for which its shares currently sell. No reasonable investor would be influenced by such statements. The "role of the materiality requirement is not to 'attribute to investors a childlike simplicity' but rather to determine whether a 'reasonable investor would have considered the omitted information significant at the time.'" *See Hillson Partners Ltd. Partnership v. Adage Inc.*, 42 F.3d 204, 213 (4th Cir.1994) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232–34, 108 S.Ct. 978, 983–85, 99 L.Ed.2d 194 (1988)). Instead, the complained of statements are the type of comments which are aptly called "puffing," and upon which a securities fraud action cannot be based. Therefore, the Court will dismiss as not actionable Plaintiffs' allegations as they relate to the Defendants' representations that StaffMark's stock was undervalued.

## IV. Reliance

■ Defendants contend that Plaintiffs failed to properly plead reliance as required in a § 10(b) and Rule 10b–5 claim. Plaintiffs have attempted to show reliance by invoking the "fraud-on-the market theory." The Eighth Circuit has held that causation is presumed under the fraud-on-the-market theory where "defendant's misrepresentations artificially altered the price of the stock and defrauded the market." *In re Control Data Sec. Litig.*, 933 F.2d 616, 619 (8th Cir.1991). It has more

---

11. In a related argument, Plaintiffs' contend that the Defendants committed fraud when they asserted that future mergers would be all cash, or majority cash, transactions. Plaintiffs' Complaint, ¶¶ 43, 46, and 49. In support of this, Plaintiffs point out that, on November 30, 1998, after the referenced statements were made regarding the Defendants' position on future acquisitions, Staff-Mark announced that it had completed the acquisition of Robert Walters, plc, in an all stock transaction. Plaintiffs' Complaint, ¶ 53.

However, this transaction had been agreed to in August of 1998, prior to the alleged fraudulent statements Plaintiffs referred to in their Complaint. Plaintiffs do not allege that Defendants entered into stock-for-stock transactions after representing that they would not. In addition, such stock-for-stock exchanges are common, and it is hard to believe that a reasonable investor would base his or her decision to buy or sell a company's stock on this basis.

specifically noted that a court should consider such things as whether a complaint states facts "showing that a large number of people could buy or sell the stock; that trading information on the stock was widely available; and that the market rapidly reflected new information in price" when deciding if fraud on the market has been alleged. *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 322 (8th Cir.1997).

In this case, Plaintiffs alleged that Staff-Mark publicly trades more than $25 million shares of stock, and that millions of its shares were purchased during the class period. Plaintiff's Complaint, ¶ 9. In addition, Plaintiffs have asserted that conference calls and press releases were made by Defendants which were circulated nationwide. Finally, Plaintiffs claim that the day after StaffMark disclosed its lower than expected earnings, its stock dropped 35%. In short, the Court finds that the Plaintiffs have adequately pled reliance through a fraud-on-the-market theory.[12]

## V. Conclusion

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss [13] be, and it is hereby, GRANTED in part and DENIED in part. Plaintiffs' allegations that Defendants violated § 10(b) and Rule 10b–5 by claiming that their stock was undervalued, that their management was strong enough to handle their numerous acquisitions, and that these new acquisitions were being smoothly assimilated into the Company are dismissed as not actionable. Plaintiffs' allegations that Defendants fraudulently asserted good future econom-

ic performance and high earnings remain as possible predicates for relief.

## ORDER

Before the Court is the Defendants' Motion for Partial Reconsideration.[1] The Plaintiffs have responded, and the Defendants filed a Reply to the Plaintiffs' Response. For the reasons set out below, the Court will grant the Defendants' Motion for Partial Reconsideration and dismiss the Plaintiffs' Complaint in its entirety.

## I. Introduction

In their Consolidated Complaint, the Lead Plaintiffs, three investors who acquired sizable sums of stock in Defendant StaffMark, Incorporated, bring claims pursuant to § 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, and pursuant to § 20(a) of the above referenced Act.[2] In the its Memorandum Opinion and Order (the "Opinion") issued June 29, 2000, the Court undertook an analysis of the applicable law, with particular reference to the pleading requirements set out by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") as they relate to claims brought under § 10(b) and Rule 10b–5. Ultimately, the Court concluded that, in order to state a viable claim under § 10(b) and Rule 10b–5, the Plaintiffs' Complaint must allege specific and particular facts which create a strong inference that the Defendants acted with the "re-

---

**12.** The Court will not dismiss Plaintiffs' § 20(a) claim in light of the determination that Plaintiffs have adequately pled the prerequisite § 10(b) and Rule 10b–5 claim.

**13.** Doc. No. 39.

**1.** On June 29, 2000, the Court entered a Memorandum Opinion and Order granting in part and denying in part the Defendants' Motion to Dismiss. Previously, the Court entered an Order allowing the Defendants' up to and until June 30, 2000, to file Reply to the Plaintiffs' Response to the Defendants' Motion to Dismiss. *See* Doc. No. 44. The Defen-

dants argue that their Reply, which was filed on time but after the Court had ruled on their Motion to Dismiss, addresses, in their favor, many of the issues which ultimately led the Court to allow some portions of the Plaintiffs' Complaint to survive dismissal. The Court finds merit in this argument, and will thoroughly analyze the Defendants' Motion for Partial Reconsideration.

**2.** The Lead Plaintiffs are bringing this action as a class action, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b). To date, there has been no action taken by the Court or the Plaintiffs to certify the class.

quired state of mind" specified by the Eighth Circuit, which is, at a minimum, a form of recklessness. Opinion at p. 1165.

From the outset, the Court noted in its Opinion that it had difficulty reviewing the allegations contained in the Plaintiffs' Complaint:

First, there is merit in Defendants' contentions that the Complaint sets out its allegations in a somewhat rambling format which makes review difficult. The portions of the Complaint which outline allegedly false and misleading statements made during the Class Period are lumped together into groups of quotes and excerpts from reports several paragraphs long, only then setting out the alleged facts which purportedly disprove them. In the process, it is sometimes left to the reader to ascertain which "fact" disproves a referenced statement, which obviously lessens the force of Plaintiff's allegations.

Opinion at pp. 1165–66 (footnotes omitted). Despite the Complaint's shortcomings, the Court nonetheless reviewed its allegations in order to determine if they stated a claim sufficient to satisfy the heightened pleading required by the PSLRA. To further the review process, the Court grouped the Defendants' public statements of which the Plaintiffs complained into three categories: 1) Those statements in which the Defendants represented that their numerous acquisitions were being or had been assimilated smoothly into the company and that they had the proper infrastructure to ensure the adequate management of their rapid growth; 2) those statements in which the Defendants represented that their company was performing above expectations and that their earnings would rise to a certain level; and 3) those statements in which the Defendants represented that the Company's stock was undervalued. *See* Opinion at p. 1168. After reviewing the Complaint, the Court dismissed all of the Plaintiffs' allegations it had identified as falling within the first and third group of allegedly fraudulent statements, but allowed the Plaintiffs to proceed with their securities

fraud claims based upon the statements the Court placed into category two.

Surviving in this second category were what the Court identified as representations of good performance and future earnings, found in paragraphs 43, 44, 46, 54, 57, and 59 of the Plaintiffs' Complaint. The Court summarized those allegations in a paragraph:

Of note is the allegation that, in connection with a February 4, 1999, press release, [Defendant and President and Chief Executive Officer of StaffMark, Inc. Clete T. Brewer] represented to a number of analysts that the weakness of StaffMark's growth experience in fourth quarter 1998 was waning. Plaintiffs' Complaint, ¶ 57. Also, just six days prior to announcing that the Company would report disappointing first quarter 1999 earnings, Brewer and other Staff-Mark officials represented that the Company's operations were performing strong and according to plan, and that, while December 1998 and January 1999 business had been slow, overall "business was ramping up as fast or faster than expected." Plaintiffs' Complaint, ¶ 59. Most particularly, Defendants represented, up until February 24, 1999, that the Company would earn $0.34 to $0.35 per share for the first quarter of 1999, and between $1.86 to $1.93 per share for the year. Plaintiffs' Complaint, ¶ 59. However, on March 2, 1999, the Company revised these figures to first quarter earnings of $0.22 to & 0.25 per share and yearly earnings of $1.65 to $1.69, causing StaffMark's stock price to drop dramatically.

Opinion at p. 1169. The Court then listed the facts proffered by the Plaintiffs which allegedly proved that the Defendants knew or were reckless in not knowing that the above outlined statements were false:

Paragraph 60(c): StaffMark's rate of earnings growth was slowing because of the Company's inability to provide sufficient employees to meet its clients' demands.

Paragraph 60(h): StaffMark's division and regional managers received weekly statistics or "stats" sheets which reflected hours billed, billing rates and profit margins branch by branch; moreover, a monthly profit-and-loss report was sent to them during the first week of the month and reflected the Company's actual performance for the previous month as against the budget; thus, defendants had known since early 1998 on a weekly basis that StaffMark was suffering a profitability decline in several of its key business segments such as the Georgia Region (Commercial division), Structured Logic Co. (IntelliMark division), Strategic Legal Resources (Professional division), and ClinForce, LLC (Professional division), and was not meeting its budget for revenue and earnings growth of 18%–20% without acquisitions and 30% with acquisitions.

Paragraph 60(i): Because several recent acquisitions failed to meet Company budgets ... Brewer convened a November 1998 meeting in Fayetteville of all division, regional, and business segment managers to devise a recovery strategy for going forward.

Paragraph 60(j): Several of StaffMark's principal business segments—Commercial, Financial, Permanent Placement, and Information Technology (IntelliMark) services—were experiencing slowing growth rates. In fact, as the Company later admitted in the Spring of 1998, IntelliMark's growth had slowed dramatically in the fourth quarter of 1998 and the results in January 1999 were extremely disappointing. Whereas during the first three quarters of 1998, IntelliMark had 15–20% growth, by the fourth quarter it was only 13% and in January the growth rate was in single digits.

Paragraph 60(*l*): The "Asian Flu" which adversely affected the financial markets in August and September 1998, had resulted in a hiring freeze on Wall Street and in London, adversely impacting StaffMark's business in the U.S. and abroad.

Paragraph 60(m): Strategic Legal Resources ... and Progressive Resources ... two of 11 businesses acquired by StaffMark through the second-quarter 1998, on top of 19 acquired in 1997— failed to meet their monthly budget numbers through the end of 1998.

Paragraph 60(*o*): StaffMark's key IntelliMark division had not experienced any growth in January 1999, versus expected growth of 18–20%, and grew only 4–5% in February 1999, versus budgeted growth of 18–20%.

Opinion at pp. 1169–70.

Pursuant to the Court's Order dismissing the majority of the Plaintiffs' Complaint, the above allegations of fraud comprise the only remaining potentially actionable claims against the Defendants in this case. Bearing in mind that the Eighth Circuit construes motions for reconsideration as Rule 60(b) motions, the Court will examine the Defendants' Motion accordingly. *See Broadway v. Norris*, 193 F.3d 987, 989 (8th Cir.1999). Rule 60(b) provides that a court may relieve a party from judgment or order for, among other reasons, mistake, inadvertence, excusable neglect, newly discovered evidence, fraud, satisfaction of judgment, or "for any other reasons justifying relief from the operation of the judgment." Such motions are disfavored by the law and are committed to the sound discretion of the trial court. *MIF Realty v. Rochester Assocs.*, 92 F.3d 752, 755 (8th Cir.1996).

## II. Discussion

 In its Order, the Court thoroughly analyzed the Plaintiffs' Complaint and the relevant law at hand. As to the law, it found that the Complaint must allege "specific and particular facts which create a strong inference that the Defendants acted with the 'required state of mind' in the Eighth Circuit, which ... is, at a minimum, a form of recklessness." Opinion at p. 1165. As to the statements relied on by the Plaintiffs which were not dismissed,

the Court wrote that "[a]fter reviewing Plaintiffs' Complaint, the Court concludes, with some hesitation, that it cannot state that it does not 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' with regard to the Defendants' predictions of future performance." Opinion at p. 1171. The Court is satisfied that it analyzed and described the law correctly. However, after reviewing the Defendants' Reply Memorandum and Motion for Partial Reconsideration, and, indeed, the entire record, the Court finds that its analysis of the facts in light of that law was wrong.

In essence, the Court determined that it could not say for sure that the Plaintiffs failed to meet the exacting standard of pleading set out by the PSLRA. The PSLRA, though, requires a greater showing that this. It requires a court to find conclusively that a plaintiff has stated a claim, with particularity, and that said stated claim must raise a strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(2). It is not sufficient for a plaintiff to state a claim which raises some question of sceinter, or if a plaintiff states facts which could possibly make out a scienter claim in the future. Indeed, the PSLRA was intended to stop such pleading.

Further, the Court's Opinion relied heavily on the Plaintiffs' allegation that the Defendants, as late as February 24, 1999, just six days prior to the announcement of declining earnings, had represented that business was picking up and earnings would meet previous goals. Opinion at p. 1171. However, as the Defendants point out, such an allegation, even if true, cannot form the basis for liability because the

alleged fraudulent statements occurred after the last of the Lead Plaintiffs made a stock purchase, which occurred, per the Complaint, on February 23, 1999. Therefore, it is impossible for a statement made on February 24, 1999, to have prompted a Lead Plaintiffs' purchase. As such, the Plaintiffs have no standing to challenge the February 24, 1999 statement, because "a plaintiff only has standing under § 10(b) to recover for misrepresentations occurring after the defendant has knowledge that its statements are false and prior to the date of his [or her] last purchase or sale." *Alpern v. Utilicorp United, Inc.*, 1994 WL 682861, *2 (W.D.Mo. Nov.14, 1994) (citations and quotations omitted). *See also In re Bank of Boston Corp. Sec. Litig.*, 762 F.Supp. 1525, 1532 (D.Mass.1991). Therefore, the Court incorrectly considered the Plaintiffs' allegations that the Defendants made a fraudulent misrepresentation on February 24, 1999.

After careful review of the submissions of the Plaintiffs and the Defendants, the Court concludes that it misapplied the law to the facts in its Opinion of June 29, 2000. The Plaintiffs' Complaint does not state with sufficient particularity facts which give rise to a strong inference that the Defendants acted with the requisite scienter in this Circuit.[3] As such, the PSLRA mandates the dismissal of the Plaintiffs' § 10(b) and Rule 10b–5 claims, which results in the dismissal of the Plaintiffs' Complaint.[4]

### III. Conclusion

IT IS THEREFORE ORDERED that Defendants StaffMark Inc. and Clete T. Brewer's Motion for Reconsideration[5] be,

**3.** Despite the fact that Rule 60(b) motions are disfavored by the law, they are appropriate in certain circumstances. Had the Court awaited the Reply of the Defendants, which was timely filed by virtue of a previous Order, the Court's first Opinion most likely would have been changed to dismiss the Plaintiffs' Complaint in its entirety. At any rate, the Court concludes that it made a clear error in its previous ruling, and will grant the Defendants

relief from that previous Opinion and Order pursuant to Rule 60(b)(6).

**4.** Because the Plaintiffs have failed to present an actionable claim under § 10(b) or Rule 10b–5, the Plaintiffs' claims for controlling person liability under § 20(a) are dismissed as well. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 n. 12 (8th Cir.1997).

**5.** Doc. No. 51.

and it is hereby, GRANTED. The Plaintiffs' Complaint is dismissed in its entirety.